787 F.Supp. 1557 (1992)
UNITED STATES of America, et al., Plaintiffs,
v.
STATE OF OREGON, et al., Defendants,
and
Confederated Tribes of the Colville Reservation, Plaintiff-Intervenor.
Civ. No. 68-513-MA.
United States District Court, D. Oregon.
March 16, 1992.
*1558 Kevin Q. Davis, Stoel, Rives, Boley, Jones & Grey, Portland, Or., Stephen V. Goddard, Deputy Atty. Gen., Dept. of Fish & Game, Clive J. Strong, Deputy Atty. Gen., Chief, Natural Resources Div., Office of the Atty. Gen., Boise, Idaho, for State of Idaho.
James Wexler, Mitchell Lang & Smith, Seattle, Wash., amicus curiae.
Thane Tienson, Copeland, Landye, Bennett & Wolf, Portland, Or., amicus curiae.
Vernon Peterson, Regional Solicitor's Office, Dept. of the Interior, Portland, Or., William White, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for U.S.
Alan C. Stay, Bruce Didesch, Robert C. Weaver, Jr., Nespelem, Wash., for plaintiff-intervenor Confederated Tribes of the Colville Reservation.
Timothy R. Weaver, Yakima, Wash., for the Confederated Tribes and Bands of the Yakima Indian Nation.
Howard G. Arnett, Marceau, Karnopp, Peterson, Noteboom & Hubel, Bend, Or., for the Confederated Tribes of the Warm Springs Reservation of Oregon.
Craig Dorsay, Oregon Legal Services, Portland, Or., for the Confederated Tribes of the Umatilla Reservation.
Douglas Nash, Nez Perce Tribal Executive Committee, Office of Legal Counsel, Lapwai, Idaho, for Nez Perce Tribe of Idaho.
Candy L. Jackson, Shoshone-Bannock Tribes, Fort Hall, Idaho, Lori Irish Bauman, Ater, Wynne, Hewitt, Dodson & Skerritt, Portland, Or., for Shoshone-Bannock.
Stephanie Striffler, Geoffrey Huntington, Eric Bloch, Asst. Attys. Gen., Dept. of Justice, Portland, Or., for State of Or.
Robert K. Costello, Asst. Atty. Gen., Dept. of Fish and Wildlife, Washington State Atty. General's Office, Olympia, Wash., for State of Wash.
Charles Turner, U.S. Atty., Portland, Or., for U.S.

AMENDED OPINION[1]
MARSH, District Judge.
Plaintiff-intervenor Confederated Tribes of the Colville Reservation ("Colville") filed a complaint in intervention seeking injunctive relief and a declaration that it is the successor in interest to the Wenatchi, Entiat, Chelan, Columbia, Palus and the Chief Joseph Band of Nez Perce Indians, and as such, it is entitled to exercise Columbia River off-reservation fishing rights reserved by those tribes in the Treaty at the Walla Walla Valley on June 9, 1855, 12 Stat. 951, II Kapp. 698, ratified March 8, 1859 ("Yakima Treaty") and the Treaty at Walla Walla Valley with other bands of Nez Perce, June 11, 1855, 12 Stat. 957, II Kapp. 702, ratified March 8, 1859 ("Nez Perce Treaty"). The Warm Springs, Yakima, Umatilla and Nez Perce Tribes oppose Colville's proposed intervention. The Yakima Nation and Nez Perce Tribe actively took part in opposing intervention at trial. Prior to trial, the Nez Perce and Colville tribes entered an agreed statement of facts, and thus, their dispute is limited to the legal implications of the agreed upon historical facts regarding the Chief Joseph Band of Nez Perce. The Yakima and Colville tribes agreed upon a number of facts regarding the Wenatchi, Entiat, Chelan, Columbia and Palus tribes, as set forth in the pretrial order, but actively disputed facts surrounding the movement of members of those tribes to the Colville Reservation as well as any legal significance to be attached to that movement. The states of Washington and Idaho indicated that they had no opposition to Colville intervention. *1559 The state of Oregon and the United States assent to intervention upon Colville establishing treaty rights. The Shoshone-Bannock took no active participation in the trial.
A three day court trial was held July 21-23, 1991. The following constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

BACKGROUND
The Yakima Treaty of 1855 was entered into between Governor Stevens on behalf of the United States and "delegates" of the Yakima, Palus (or Palouse), Pisquouse, Wenatshapam, Klikatat, Klinquit, Kow-was-say-ee, Li-ay-was, Skin-pah, Wish-ham, Shyiks, Oche-chotes, Kah-milt-pah, and Seap-cat, confederated tribes and bands of Indians which were "considered as one nation, under the name of `Yakima,' with Kamaiakun as its Head Chief." Under the treaty, the tribes agreed to cede all interest in land they formerly occupied in Eastern Washington, reserving a single tract represented by the present day Yakima Reservation. In addition, the "confederated tribes and bands of Indians" reserved the exclusive right to take fish from waters within or bordering the reservation and "also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory."
The Nez Perce Treaty of 1855, negotiated at Walla Walla, contains similar provisions for the ceding of title to all lands occupied in Washington and Oregon, reserving a tract of land represented, in part, by the present day Nez Perce Reservation, and reserving similar exclusive rights to fishing on and bordering the reservation, with rights to fish in usual and accustomed places off-reservation "in common" with non-Indian territory citizens. The treaty was signed by 54 Indians on behalf of the Nez Perce, including Chiefs Lawyer and Old Joseph.
The historical background surrounding the formation of the United States' treaties with the Indians in the Pacific Northwest is set forth in greater detail in Judge Boldt's decision in United States v. Washington, 384 F.Supp. 312, 330-334 (W.D.Wash.1974), aff'd 520 F.2d 676 (1975). In this opinion, Judge Boldt made extensive findings and conclusions which, together with the findings and conclusions previously entered in this case, laid the groundwork for the settlement and adoption of the Columbia River Management Plan in effect today. In his decision, Judge Boldt traced the history of the so-called "Stevens" treaties, made factual findings as to what constituted the "customary and usual" off-reservation fishing sites for the individual tribes and made legal conclusions as to the balance between tribal rights and state police power. The court issued an injunction against the state of Washington from interfering with tribal fishing rights, except to the extent that such regulation is necessary to safeguard fish resources from depletion or destruction. In addition, Judge Boldt held that the treaty tribes were entitled to take up to 50% of the harvestable fish on runs passing through their traditional off-reservation fishing grounds. Judge Boldt's decision was "substantially upheld" by the Supreme Court in Washington v. Washington Passenger Fishing Vessel Assn., 443 U.S. 658, 685, 99 S.Ct. 3055, 3074, 61 L.Ed.2d 823 (1979). See United States v. Suquamish Indian Tribe, 901 F.2d 772, 774 (9th Cir. 1990).
The present case, United States v. Oregon, Civ. No. 68-513-MA, is the outgrowth of a consolidation with Sohappy v. Smith, Civ. No. 68-409, in 1968.[2] As in United States v. Washington, these cases were brought against the State of Oregon to define the Indians' treaty right to take fish "at all usual and accustomed places" on the Columbia River and its tributaries and to determine the extent to which the State of Oregon could regulate fishing after Puyallup Tribe v. Department of Game, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 *1560 (1968).[3] Four Indian Tribes, including the Yakima Indian Nation, the Confederated Tribes and bands of the Warm Springs Reservation of Oregon, the Confederated Tribes of the Umatilla Reservation and the Nez Perce Tribe of Idaho, intervened as plaintiffs in the action filed by the United States. Sohappy, 302 F.Supp. 899 (D.Or. 1969).
On July 8, 1969, the Hon. Robert C. Belloni construed the Indians' treaty fishing right and considered the manner and extent to which the State of Oregon could regulate fishing. Sohappy, 302 F.Supp. at 911-12. Unlike the Boldt decision however, Judge Belloni limited the scope of his findings and conclusions to setting the parameters within which the state could regulate tribal fishing. The court concluded that the state's power to regulate Indian fishing rights was limited to those regulations necessary for conservation and that such regulations had to be non-discriminatory and meet appropriate standards. Id., at 907-910. Judge Belloni retained jurisdiction to grant further or amended relief: "[t]his court cannot prescribe in advance all details of appropriate and permissible regulation of the Indian fishery ... the requirements of fishery regulation are such that many of the specific restrictions, particularly as to timing and length of seasons cannot be made until the fish are actually passing through the fishing areas." Id., at 911. Thus, this court has exercised, and continues to exercise, jurisdiction whenever any party applies to the court for equitable relief from the decree.
Between 1969 and 1976 the parties appeared before the court several times. Judge Belloni urged the parties to adopt a comprehensive plan for allocation and management of Columbia River anadromous fish. In 1974, the State of Washington was allowed to intervene. In 1983, the Ninth Circuit allowed the State of Idaho to intervene.
In 1977, the parties presented a five year plan to the court entitled "A Plan for Managing the Fisheries on Stocks Originating from the Columbia River and its Tributaries above Bonneville Dam." This original plan set conservation goals for each fish species, established fishing regulations and provided for the establishment of future management techniques. However, the plan did not establish fishing locations, times or quotas. United States v. Oregon, 718 F.2d 299, 302 (9th Cir.1983). Instead, these details are regulated through the Columbia River Compact, an interstate agency created by Oregon and Washington and ratified by Congress. Id.
With the expiration of the original plan in 1982, the court ordered the parties to attempt to agree upon a revised or modified agreement. United States v. Oregon, Civ. No. 68-513 (Aug. 24, 1983; and Sept. 6, 1983). Pursuant to these orders, the parties continued negotiations on a comprehensive plan, during which time they operated under several one-year management plans. In 1988 a plan was submitted to the court with the approval of all but two parties, Idaho and the Shoshone-Bannock. I adopted this plan, with a few restrictions, on October 7, 1988.
Currently, when any party in this case objects to a decision of the Compact, it may submit any matter that is within the continuing jurisdiction of this court to the court for determination under Paragraph CI and Part IV of the Agreement. See e.g. United States v. Oregon, 718 F.2d 299 (9th Cir.1983) (district court may alter fishing season to restore tribal fishing area and may review Compact's calculation of deficit re Indian share of harvest) and my orders of Sept. 27, 1991 and October 24, 1991 on the Yakima and Umatilla Tribes' motions for temporary restraining orders.
Thus, Colville seeks intervention in a proceeding that has been under the continuing jurisdiction and supervision of this court since 1968. On August 7, 1989, I granted *1561 Colville's motion to intervene, on the condition that it first establish that it has federally secured off-reservation treaty fishing rights either by initial grant or by succession in interest.
On February 20, 1990, I granted in part and denied in part the Colville's motion for partial summary judgment on the issue of collateral estoppel of factual issues litigated before the Indian Claims Commission (ICC), reported at 7 Ind. Cl. Comm. 794 (1959), 12 Ind. Cl. Comm. 301 (1963) and 15 Ind. Cl. Comm. 196 (1965), and before the Court of Claims in The Confederated Tribes of the Colville Reservation v. The Yakima Tribes of the Yakima Reservation, 204 Ct.Cl. 868 (1974) (collectively referred to as the "claims decisions"). In those cases, the ICC was asked to resolve a dispute between the Yakima and Colville Tribes regarding their respective claims for unpaid compensation for lands ceded under the Yakima treaty of 1855. In allocating the damage award, the ICC found that the Chelan, Wenatchi, Entiat, Columbia and Palus tribes were parties to the Treaty of 1855, 7 Ind. Cl. Comm. at 800-01, and that the Colville represented their interests for the purpose of allocating a monetary damage award. In so doing, the ICC made the following factual determinations: (1) the Yakima Tribe was "not synonymous with nor the successor to the Yakima Nation which was created in 1855 and was ... wronged by the treaty of 1855," (2) the "Yakima Nation which was created in 1855 does not exist as an entity today,"[4] (3) "a significant number of Indians who were members of various of the fourteen tribes or groups comprising the Yakima Nation became located on the Colville Reservation. Indians from the Chelan, Entiat, Wenatchi, Columbia and Palus tribes in particular became located in large numbers on the Colville Reservation," 12 Ind. Cl. Comm. at 368, and (4) "[t]here was no movement as a tribe by either the Chelan, Entiat, Wenatchi or Columbia onto the Yakima reservation although individual members of each of the four tribes did move to that reservation." 7 Ind. Cl. Comm. at 802. While the ICC found that "Chief Moses and his followers did, in fact, move onto the Colville Reservation and the members of his band or the descendants thereof have continued to reside on that reservation until the present date," 7 Ind. Cl. Comm. at 811, accord 12 Ind. Cl. Comm. at 368, it did not find that the Chelan, Wenatchi, Entiat, Columbia, and Palus tribes moved to the Colville Reservation "as tribes."
In my opinion of February 20, 1990, I found that many of the issues raised by the Colville's motion for summary judgment were "in substance the same" as those factual issues resolved in the claims decisions and that collateral estoppel applied. However, I held that the claims decisions left unresolved the issue of whether the aboriginal tribes moved "as tribes" onto the Colville Reservation and that matters as to the assimilation, consolidation and/or merger of the aboriginal tribes with other tribes located on the Colville Reservation had not been resolved as to prospective fishing rights. I further found that the ICC's conclusion that Colville represented these tribes for the purpose of allocating the damage award did not answer the question presented in this case as to whether Colville may exercise treaty fishing rights.

FINDINGS OF FACT

a. Nez Perce

The Nez Perce and Colville Tribes have submitted agreed facts along with "secondary materials" in support of those facts. I have reviewed these records and find them to be an accurate depiction of the historical record. Accordingly, I adopt the parties' agreed facts as my factual findings as to the Chief Joseph Band of Nez Perce.[5] For the purposes of this opinion, I take particular note of the following facts:
*1562 The "Chief Joseph Band"[6] of Nez Perce is a title employed to describe a "subgroup" of the Nez Perce which occupied the Wallowa-Imnaha area in aboriginal times up to the Nez Perce War of 1877. Verne Ray, Ethnohistory of the Joseph Band of Nez Perce Indians: 1805-1905, pp. 4, 9 and 87. The Chief Joseph Band considered maintenance of their traditional territory in the Wallowa-Imnaha drainages of the utmost importance. Id., at 10 and 91, (citing declarations of Chief Joseph: "[W]e will defend this land as long as a drop of Indian blood warms the hearts of our men.")[7] Thus, when the Nez Perce Treaty of 1863 was negotiated by Lawyer, extinguishing title to approximately 90% more land and restricting the Nez Perce reservation to 750,000 acres, several Nez Perce leaders refused to sign, including Old Joseph, head of the Wal?wama Band which lived outside of the proposed reservation land.[8] The 1863 treaty caused a sharp division between the Nez Perce led by Lawyer, who resided in the North and who was recognized by the U.S. as the head chief of the Nez Perce, and the Chief Joseph Band of Nez Perce, known at the time as the Wal?wama Band. Ray, Ethnohistory of the Chief Joseph Band, pp. 21-24, 32-33.[9]
The Chief Joseph band of Wal?wamas continued to live on their traditional lands in defiance of the 1863 treaty until October of 1877 during the Nez Perce war. Joseph surrendered to General Miles in Montana and he and the Wal?wama Band were sent to Kansas. Of the approximately 430 Nez Perce sent to Fort Leavenworth, at least one-quarter perished within a few months due to poor living conditions, severe weather and a lack of medical care. Ray, Id., at 64-66. In 1879 the Joseph Band was again moved 180 miles into Oklahoma and several more perished on this trip and in the course of the subsequent winter months due to the dire conditions they were forced to endure. Id., at 69. Between 1885 and 1923, Congress passed a series of appropriations for the "Chief Joseph Band," which allowed them to return to the Northwest. Beginning on May 17, 1885, approximately 150 persons were sent to the Colville Reservation and 118 were sent to Lapwai in Idaho. Id., at 75. The band was divided out of concerns related to the pending indictments against Chief Joseph and his followers in Idaho. Id., at 76. Joseph and his followers were initially sent to Fort Spokane and within a few months moved to the Nespelem valley on the Colville Reservation. Id., at 79-80. One family of Chief Joseph's band remained at Fort Spokane and eventually moved to the Nez Perce Reservation in Idaho. Id., at 81. Throughout this period, Joseph actively disputed all proposals and efforts to move his band to any territory other than the band's original tribal territory in the Wallowa-Imnaha drainage. Id.

b. Wenatchi, Entiat, Chelan, Columbia & Palus

The Yakima and Colville Tribes have agreed that a number of facts are not in dispute based, in part, upon my ruling on Colville's motion for summary judgment. Thus, to the extent that I have not already adopted these facts as my findings in this case, I find agreed facts # 1-43 to be an accurate depiction of the historical record. Accordingly, I adopt these facts # 1-43 as a portion of my factual findings as to the Wenatchi, Entiat, Chelan, Columbia and Palus Indians.[10]
*1563 As noted above, Article III of the Yakima Treaty expressly reserved to the Yakima Nation and its members the exclusive right of taking fish in all the streams that ran through or bordered the reservation and also the right of taking fish at all usual and accustomed places in common with the citizens of the territory. Following the ratification of this treaty by Congress in 1859, many of treaty signatories moved onto the Yakima Reservation as anticipated. However, not all proceeded as "planned" by the U.S. Although they were parties to the Yakima treaty, a "significant number" of the Chelan, Wenatchi, Entiat, Columbia and Palus refused to move onto the Yakima Reservation.[11]
Chief Moses, who was the chief of the Columbia and was recognized by the United States as the spokesperson for the Wenatchi, Entiat, Columbia and Chelan, was among those people who refused to move onto the Yakima reservation. The so-called "Columbia Confederacy" led by Moses consisted of tribal members who were predominantly Salish speaking and who were closely related by geographic proximity and inter-marriages. See Verne Ray, The Columbia Indian Confederacy: A League of Central Plateau Tribes, at p. 771 (1960).[12] Prior to the United States' negotiations with Moses, the historical records are silent as to any contact between the government and members of the Wenatchi, Entiat, Columbia or Chelan. Id., at 773.
Moses was not present at, and there is no evidence to suggest that he took part in the Walla Walla treaty negotiations in 1855.[13] In addition, Tookolookin, a Wenatchi Chief who was present and signed the treaty, appears to have done so on his own given the lack of documentary or historical sources to indicate the presence or participation of a Wenatchi delegation. Ray, Tribes (1971), at p. 47. There is no mention in the records of the presence of Columbia, Chelan or Entiat. Id., at 47-48.
Instead, Moses negotiated directly with federal authorities in an attempt to gain a separate reservation for his people. After the government failed at several attempts to get members of Moses' group to go onto the Yakima Reservation,[14] in 1879 the U.S. agreed to create a reservation for Moses, known as the "Moses Columbia Reservation," out of land encompassing a portion of the aboriginal lands of the Wenatchi, Entiat, Columbia and Chelan directly to the west of the Colville Reservation. Permission was later given for Methow and Okanagan Indians to live within this reservation also. Ray, Columbia Confederacy, at p. 788. The agreement itself is silent as to fishing rights and there is nothing in the record of the negotiation process to indicate that fishing rights were discussed.
However, neither Moses, nor his followers, nor the federal government was satisfied with the 1879 agreement and no one party fully honored its terms. The Entiat people were moved onto the reservation by force of the Army, many of the Chelans were already present, and the Wenatchi and Columbia Indians simply remained where they were off the proposed reservation. Ray, Id., at 788-89. Moses refused to move onto the reservation and the U.S. never gave its final approval.
*1564 Just prior to this time, the Colville Reservation was set aside by Executive Order on July 2, 1872 for "Indians as the Department of the Interior may see fit to locate thereon." Tribes specifically contemplated by this order included the Methow, Okanagan, San Poel, Colville, Calispel, Spokan, and Coeur d'Alene.[15] Palmer, Direct Testimony, at p. 6-3.
In 1883 Moses and the U.S. returned to the bargaining table. Moses, along with Chiefs Sarsarpkin, Lot and Tonasket, negotiated with the United States to restore the Moses Reservation of 1879 to the public domain and to allow Moses and his people to take allotments on the Moses Columbia Reservation or remove to the Colville Reservation. Members of the Wenatchi Tribe were moved to the Colville Reservation with funds provided by Congressional Acts in 1902 and 1904. Members of the Columbia and Entiat tribes moved to allotments on the Colville reservation, attempting to stay on allotments which fell within their traditional areas. However, the members of the Chelan tribe who already resided in areas within the Moses Columbia Reservation prior to 1883, and who refused to take allotments on the Columbia Reservation under the 1883 Moses Agreement, were moved to the Colville Reservation by U.S. military forces in 1890.
The movement of members of the Palus Tribe to the Colville Reservation was more scattered and extended over a longer period. As explained by David Chance, the Palus formed a distinct ethnic group consisting of six to twenty-seven villages located along the Snake River. Each village band was headed by a chief and several also had a "second chief," who might head a part of the band in pursuit of food away from the village. Chance concludes, based upon their philosophic ties to the Dreamer Religion, that the Palus would have been particularly disinclined to accept white Anglo-Saxon numerical groupings and relocation to a reservation with distinct boundaries. At least two Palus chiefs attended the Yakima Treaty negotiations and Chief Kahlahtoose signed the treaty and was recognized by the United States as the "leader" of the Palus. It is believed that Kahlahtoose was killed sometime during the fighting between the Indians and the U.S. in 1858.
Members of the Palus also attended the Nez Perce Treaty Council in 1863 out of concern that the Nez Perce might cede portions of Palus traditional homeland. Different members of the Palus spoke with U.S. officials in the 1870's and 1880's and communicated their desire to remain on their traditional tribal territory and obtain allotments along the Snake River.
In the 1880's, following the Nez Perce War of 1877, government agents reported to General Howard that a few "disaffected" Palus, Nez Perce and other tribes were beginning to visit the Colville Valley. Chance estimates that approximately 100 Palus moved to the Colville reservation between 1885 and 1900 and settled in the area of Nespelem, but continued to return to visit their native lands in the summers. The "leading chief" of the Palus on the Colville Reservation in the early part of the 20th Century was Cleveland Kamiakin, one of four sons of Chief Kamaiakun, who traced his ancestry to the Palus, Yakima and Spokan, and who signed the Yakima Treaty, ostensibly on behalf of the Yakima and Palus.

c. The Confederated Tribes of the Colville Reservation

The present day Colville Confederacy governs under a Constitution and By-laws ratified on February 26, 1938 and approved by the Commissioner of Indian Affairs on April 19, 1938. The proposed adoption of a Constitutional form of government under the Indian Reorganization Act was controversial and was debated at length by leaders within the Colville Confederacy. Leading members of the Wenatchi, Palus and the Chief Joseph Band of Nez Perce actively opposed the constitutional reorganization. Dr. Jay Miller submitted written testimony regarding the effects of governmental policy on tribal structure. He concludes that the tribes were "forced" to *1565 accept the new structure by the federal government. The Confederated Tribes of the Colville Reservation is recognized today as being comprised of members of the Methow, Okanagan, San Poel, Colville, Calispel, Spokan, Coeur d'Alene, Wenatchi, Entiat, Chelan, Columbia, Palus, Kittias, Wanapam, Yakima, Klickitat, Wishram, Nez Perce and Skeen. As of 1954, members of the Wenatchi, Entiat, Chelan, Columbia, Palus, and Chief Joseph Band of Nez Perce comprise approximately 866 of the approximate total population of 2,887 enrolled Colville members.
At trial, Colville presented testimony from many of its tribal elders regarding Wenatchi, Entiat, Chelan, Columbia and Palus and Nez Perce tribal traditions and practices which have been preserved and continued at the Reservation. Members of the Wenatchi, Chelan, Columbia and Entiat maintained tribal cemeteries both on and off the reservation. Mathew Dick testified about the Wenatchis' continuous exercise of their rights to gather food off-reservation in traditional Wenatchi territory. Celia Dick testified about Wenatchi efforts to continue fishing in the Icicle River. Julianne Dick, the granddaughter of Chelan Bob, testified about fishing and root gathering in traditional Chelan territory throughout her life. Chance testified that Palus leaders continue to function as they traditionally have and the Palus members continue to remain distinct and independent.
The Chief Joseph Band of Nez Perce maintain a ceremonial Long House on the reservation. According to Verne Ray, who visited Joseph's people at Colville in 1928, the band lived in "distant isolation" and continued to perform traditional mid-summer ceremonies. Ray, Ethnohistory of the Chief Joseph Band, p. 98. Ida Desautel, an Elder, testified at trial that the band continues to maintain separateness by preservation of the Nez Perce language, customs and religion.
Margie Hutchinson testified about how tribal records are maintained by the Colville Agency, and the process whereby Colville members are given a specific tribal designation. She explained that most Colville members are affiliated with the tribes to which their parents claim lineage. For example, an Indian whose mother is a Yakima and whose father is an Okanagan could identify herself as either a Yakima, an Okanagan or both. If she were also enrolled as a Colville member, she would claim to be both a Colville and an Okanagan, a Colville of Yakima lineage, or all three. However, a "Colville" designation only requires enrollment in the Colville Confederacy, while an "Okanagan" designation would require a minimum 25% blood-line. In contrast, membership in the Yakima or Nez Perce Tribes require both a minimum 25% blood line and enrollment. Mary Marchand, testified that residence on the Colville Reservation is not required for membership.
All of the members of the Colville Confederacy who testified at trial demonstrated a desire to adhere to ancestral customs. In addition, they expressed a sincere pride in their Colville membership and in the activities taking place within the Colville Reservation.

CONCLUSIONS OF LAW

Introduction
Counsel for all parties must be commended for their skill in preparing and arguing this case. I have spent a great deal of time contemplating the legal and equitable concerns raised by counsel and have found that, without maintaining a focus on the central issue presented with this complaint in intervention, one is easily lead astray. Due in part to counsels' skill and familiarity with this field and also due to the unique challenges posed by legal analysis of historical and tribal events, I am compelled to carefully delineate and define what I find is the central or "core" issue raised by the Colville complaint in intervention, and further, to emphasize what is not raised thereby.
First, the issue before me is not whether individual members of the Colville Confederacy "lost" treaty rights by enrolling as Colvilles. Nor is the issue whether the Colville Confederacy should exercise rights on behalf of these bands in the place of the *1566 Yakimas and the Nez Perce  the parties expressly agreed that the only factual determination before me is the constituency of the Colville Reservation, and therefore, I make no findings or comparisons as to the number of treaty Indians on the Colville Reservation as opposed to the Yakima or Nez Perce Reservations. Finally, the issue is not whether individuals who reside on the Colville Reservation and who are able to trace their ancestry to treaty signatory tribes may fish, as that is a matter within exclusive tribal jurisdiction and is subject to the rules and regulations of the tribes who exercise such regulatory power.
I find that the issue before me is whether The Confederated Tribes of Colville Reservation may exercise authority, as a separate Treaty Tribe, to administer or regulate off-reservation treaty fishing rights based upon the fact that some of its members can trace their ancestry to parties to the Yakima or the Nez Perce Treaties of 1855.

Discussion
In order to decide what I have identified as the issue in this case, I must first consider who can hold treaty rights, or wherein the authority to control the exercise of those rights is vested.
Rights, enumerated under treaties, are reserved to communities or "tribes" rather than to individuals. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 671-73, 99 S.Ct. 3055, 3067-68, 61 L.Ed.2d 823 (1979); United States v. Washington, 476 F.Supp. 1101, 1110 (W.D.Wash. 1979) aff'd, 641 F.2d 1368 (9th Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). Because individuals have no enforceable off-reservation fishing rights, when and how an individual may use treaty rights is an "internal affair" of the tribe. Settler v. Lameer, 507 F.2d 231, 237 (9th Cir.1974).
Accordingly, the Ninth Circuit has held that any "tribe" which seeks to assert fishing rights as a treaty signatory must first establish treaty tribe status. United States v. Suquamish Indian Tribe, 901 F.2d 772, 776 (9th Cir.1990). Treaty tribe status may be established by "a group of citizens of Indian ancestry [which has] descended from a treaty signatory and has maintained an organized tribal structure." Id., citing United States v. Washington, 520 F.2d 676, 693 (9th Cir.1975); see also United States v. Washington, 459 F.Supp. 1020, 1037 (W.D.Wash.1978), aff'd, 645 F.2d 749 (9th Cir.1981) (intervention requires prima facie evidence of treaty status and tribal organization, noting however, that neither Congress nor the Executive has defined "tribe" in terms of federal relationships with Indians).[16]
In early historic time in the Interior Plateau, there were at least three levels of political organization: village, band and tribe. Palmer, Direct Testimony, p. 1-3. Although aboriginal bands and villages fished and gathered food in "usual and custom" areas, state lines, fences and political boundaries were unknown. Further, the centralized leadership structure that we recognize today was not a part of the tribal structure. See Verne Ray, Native Villages and Groupings of the Columbia Basin, Pacific Northwest Quarterly Vol. 27, p. 111 (noting wide variations in political units, understanding of which is "hampered by present day confusions with linguistic units, arbitrary Indian Service administration units, and reaffiliations growing out of widespread decimation"). Within a single band, there may have been five or six different leaders, each of equal standing, who "governed" in a particular area of expertise, such as hunting or medicine. Based upon these unique historical groupings, no single identifying label is determinative  i.e. a group identified as a "band" which functioned as a cohesive political unit may *1567 fall within the meaning of the word "tribe," as used by the courts, if it maintained continuous cultural and political cohesion.
Further, in determining treaty tribe status, I am aware that government recognition is not determinative of treaty rights. United States v. Washington, 641 F.2d at 1371. Rather, the "proper" inquiry must focus upon the maintenance of an organized tribal structure where "defining characteristics of the original tribe persist in an evolving tribal community." Id. While a degree of "assimilation" into other cultures is inevitable, it will not result in an abandonment of tribal structure unless the assimilation is "complete." Id., at 1373. See also Northern Arapahoe Tribe v. Hodel, 808 F.2d 741, 744 (joint occupancy of reservation does not, standing alone, constitute merger or consolidation of two tribes). Thus, I must make certain allowances for evolution and some dispersion attributable to inter-marriage and educational or technological advances.
The Colville Confederacy bears the burden of establishing treaty tribe status. United States v. Washington, 730 F.2d 1314, 1316-17 (9th Cir.1984). The "sole purpose" of requiring proof of tribal status is to ensure that the group asserting treaty rights is the group named in the treaty. United States v. Washington, 641 F.2d 1368, 1371 (9th Cir.1981).
One of the unfortunate aspects about sitting as a trial court on a case of this kind in 1991, is the immediate awkwardness presented in attempting to apply modern legal Anglo-Saxon principles and precedent to events involving tribal associations which took place over 130 years ago. What we recognize today as a political "leader" or an organized form of government simply does not apply to native American culture of the 19th Century. As the parties agree, Indian culture at the time of the Stevens treaties was vastly more complex than the treaties recognized. Further, the Indians' cultural and political responses to the encroachment of white settlers was diverse and often, divisive. Inter-tribal and inter-cultural divisions commonly arose amongst formerly cohesive groups over religion and to what extent, if any, Western culture should be adopted into tribal traditions. See generally, Merrill D. Beal, "I Will Fight No More Forever: Chief Joseph and the Nez Perce War, 16-47 (Ballentine Books, 1963).
This awkwardness is further exacerbated by the nature of the treaties themselves which were designed and created by Governor Stevens in haste, at a time when he was under pressure from the federal government to extinguish Indian title to all lands and relocate Indians to reservations. See United States v. Washington, 520 F.2d 676, 688 (9th Cir.1975) ("tribes" in western Washington were constructed arbitrarily by Stevens for convenience in negotiating the treaties). Through Governor Stevens and the treaty commission, small tribes or bands were grouped or consolidated into larger tribal units that became the entities with which the United States negotiated the treaties. United States v. Washington, 384 F.Supp. 312, 354-55 (W.D.Wash. 1974), aff'd 520 F.2d 676 (9th Cir.1975), cert. denied 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97, reh'g denied 424 U.S. 978, 96 S.Ct. 1487, 47 L.Ed.2d 750 (1976). Thus, to the extent that Stevens made any effort to recognize and preserve traditional Indian territory in drawing the boundaries for the reservation or to group traditional tribal entities for the purposes of political negotiation, his efforts, as reflected in the treaties produced, were woefully inaccurate.
Finally, I recognize that reference to and reliance upon legal precedent must be approached with caution given the unique nature of Indian culture and the unique facts and circumstances that each case presents. Thus, in my review of other cases in which similar claims of intervention based upon treaty tribe status have been raised, I have found certain limited parallels and contrasts which I can draw, but no binding conclusions. Therefore, my discussion of these cases is intended merely to illustrate the spectrum of historical and legal precedents in this area.
I find the case of United States v. Washington, 476 F.Supp. 1101 (W.D.Wash.1979) *1568 one of the more helpful decisions to demonstrate the kinds of factors I may look to in determining whether the Colville Confederacy should be recognized as a "successor Indian government," and thereby vested with the authority to administer treaty rights.[17] Although the facts differ, the legal theories urged, such as successor in interest status, are similar to the arguments urged by Colville. In that case, five "groups" claiming to be tribes which were parties to the Medicine Creek and Point Elliot treaties sought fishing rights through intervention in the case. The Duwamish, Samish, Snohomish, Snoqualamie and Steilacoom groups had members who were descendants of treaty tribes and, as such, had obtained judgments in the Indian Claims Commission as "groups." As to the present day Duwamish tribal organization, the court found that it lacked attributes of sovereignty, had not been recognized as a governmental or political entity by the U.S., did not have an approved membership roll and that members had not lived as a continuous, separate and cohesive Indian cultural or political community. Id., at 1105. Thus, although many, or perhaps even all, of the individual members of the Duwamish "group" were descendants of a treaty tribe, the court found that the proposed Duwamish intervenor was not an "entity" that descended from any of the tribal entities that were signatory to the treaty. Id.
As to the Samish Indians, the court found that its members were descendants of the 1855 Samish Indians who were represented at the Treaty of Point Elliott by Chow-its-hoot, the Lummi signer. Id., at 1106. Following the treaty, most of the Samish moved to the Lummi reservation. Later, others moved to the Swinomish Reservation. Unlike the Confederated Tribes of the Colville Reservation, the proposed intervenor Samish Tribe exercised no sovereignty over its members or any territory, was not recognized by the U.S., and had no approved organizational structure or membership rolls. However, the Samish did have a constitution, by-laws, a tribal council and claimed 549 members. The court found that the proposed Samish intervenor was not an entity descended from any of the tribal entities that were signatories to treaty since its members had not maintained an organized tribal structure and had "no common bond of residence or association other than such association as is attributable to the fact of their voluntary affiliation." Id.
As to the Snohomish, the court found that the proposed intervenor was composed "primarily" of persons who descended from Indians who lived in the vicinity of the Snohomish River in 1855 and who were a party to the 1855 Treaty of Point Elliott. The court found that, like the Samish, the Snohomish exercised "no attributes of sovereignty over its members or any territory," maintained no approved membership rolls and was not recognized by the U.S. as a political entity. However, it did have a constitution, by-laws, a tribal counsel and claimed 720 members. The court concluded that the members of the Snohomish "tribe" did not maintain a continuous, separate and cohesive cultural or political community, and thus, was not an entity descended from a treaty signatory. Id.
As to the Snoqualamie, the court found that the proposed intervenor was composed primarily of persons who descended from the Snoqualamoo Indians named in the Treaty in 1855. The Snohomish Bay Reservation described in the treaty was intended for the Snoqualamie Indians. However, most remained off the reservation, some settling on the Tulalip Reservation and some enrolling in other tribal communities. Id., at 1108. As with the other proposed intervenors, the court concluded that the Snoqualamie "Tribe" had failed to maintain a continuous distinct and cohesive political or cultural structure and thus, was not an entity descended from a treaty signatory. Id., at 1108.
The court made similar findings and conclusions as to the Steilacoom, noting however, *1569 that "significant numbers of the Intervenor Steilacoom Tribe are not descended from the Steilacoom or other Indians who were parties to the Treaty of Medicine Creek." Id., at 1110.
I also find the case of Wahkiakum Band of Chinook Indians v. Bateman, 655 F.2d 176 (9th Cir.1981) instructive. In that case, the Wahkiakum Band claimed off-reservation fishing rights on the ground that it was a beneficiary of a treaty between the United States and the Quinaults and Quillahutes which was signed on July 1, 1855 and January 24, 1856. Although Chinook were present at the treaty negotiations, they did not sign the treaties. Id., at 178 n. 4.[18] However, the Wahkiakum Band did not seek to trace its fishing rights directly to the treaties, but rather to link itself to the treaties by reference to an Executive Order issued in 1873 which expanded the Quinault Reservation for the Quinault, Quillehute, Hoh, Quit "and other tribes of fish-eating Indians on the Pacific Coast." Id., at 179. In rejecting this argument, the court held that the Wahkiakums "ignored the structure of the treaty" which could not be expanded beyond the original signatories based upon "subsequent affiliation." Id. The court noted that the Wahkiakum could share tribal rights as Quinault "affiliates" by satisfying Article III of the treaty and taking an allotment on the Quinault Reservation. However, the court found that the Wahkiakum did not independently retain tribal off-reservation fishing rights given Congressional extinguishment of "all rights" and a settlement of "all claims" with the government with the Act of August 24, 1912, 37 Stat. 518, 535. Id., at 180.
Finally, in Suquamish, 901 F.2d 772, 773-4 (9th Cir.1990), the Suquamish attempted to establish treaty tribe status by claiming it was a successor in interest to the treaty-time Duwamish Tribe.[19] The Duwamish and Suquamish were among 20 tribes which were parties to the 1855 Treaty of Point Elliott. Seattle was identified as chief of the Duwamish and Suquamish tribes in the treaty, but represented both groups in name only. Generally, the treaty-time Duwamish occupied the area around present-day Seattle and Renton, Washington. Originally, the Duwamish were to be settled on the Port Madison Reservation, within Suquamish territory. The Duwamish strenuously objected to this removal and were so hostile to the Suquamish that the Superintendent of Indian Affairs approved a sub-agency for the Duwamish on Elliott Bay at the mouth of the Duwamish River. United States v. Washington, 476 F.Supp. at 1105. In the fall of 1856, most Duwamish returned to this sub-agency. During November and December of that year, more than half of the Duwamish returned to their traditional villages upriver and along Lake Washington while others eventually relocated to the Muckle-shoot Reservation. However, around the turn of the century, forty-nine allotments were made at Port Madison, nine of which were attributed to Duwamish Indians. The district court found that evidence of these nine allotments was insufficient to show a cohesive communal decision by the Duwamish to unite with the Suquamish and concluded that the Duwamish Tribe had not merged with the Suquamish Tribe such that the Suquamish Tribe could successfully claim it was a "political successor" to the treaty-time Duwamish Tribe. Id., at 777.

Conclusions
As I noted previously, the argument urged by the Colville Confederacy in this case is unique. The Colville Confederacy did not exist when the 1855 treaties with the Yakima and Nez Perce were entered into. Thus, like the Wahkiakum Band, Colville does not claim fishing rights as a "signatory" to either treaty. However, in contrast to the Wahkiakum case, Colville does seek to establish a direct link to the *1570 1855 treaties by tracing members of identifiable groups within the Colville Reservation  i.e. the Wenatchi, Entiat, Chelan, Columbia, Palus and Chief Joseph Band of Nez Perce  to treaty signatories. Further, in contrast to the successor-in-interest argument raised by the Suquamish, Colville does not contend that it was a separate entity which "merged" or consolidated with the Wenatchi, Entiat, Chelan, Columbia, Palus and Chief Joseph Band of Nez Perce thereby obtaining treaty status as a combined political structure. Also in contrast to the Suquamish case, there is evidence in this case of an acceptance, albeit involuntary, of the combined political union of the Colville Confederacy. Finally, unlike the present day Duwamish tribal organization, the Samish, Snohomish, and Snoqualamie "tribes" who attempted to intervene into U.S. v. Washington, 476 F.Supp. 1101, the Colville Confederacy is not composed "primarily" of persons who are descendants of Indians who were named in and a party to the 1855 treaties.
Rather, Colville contends that, because the Wenatchi, Entiat, Chelan, Columbia, Palus, and Chief Joseph Band of Nez Perce have maintained "tribal" structures within the Colville Confederacy and because Colville is now their only recognized representative, the Colville Confederacy, as a whole, succeeds to the treaty interests reserved in 1855. Thus, in essence, Colville attempts to combine elements from each of the foregoing cases to establish treaty tribe status. However, such an amalgam of arguments  of maintaining distinct organized tribal structures while also "merging" into the Colville Confederacybecomes inconsistent with itself.
Based upon my factual findings regarding the movement of Indians to the Colville Reservation and the present day composition of the Colville Confederacy, I conclude that, even if I were to find that the members of Wenatchi, Entiat, Columbia, Chelan, Palus and Chief Joseph Band of the Nez Perce moved to the reservation and maintained an organized "tribal" structure, they have not "merged" into the Colville Confederacy such that Colville could be declared to have "treaty tribe" status. The proposed intervenor in this case is the Confederated Tribes of the Colville Reservation which includes members of the Methow, Okanagan, San Poel, Colville, Calispel, Spokan, Coeur d'Alene Kittitas, Wanapam, Yakima, Klickitat, Wishram and Skeen tribes as well as Indians who trace their lineage to the Wenatchi, Entiat, Chelan, Columbia, Palus, Chief Joseph Band of Nez Perce. As noted previously, members of the Wenatchi, Entiat, Chelan, Columbia, Palus and Chief Joseph Band of Nez Perce comprised approximately 866 of the approximate total population of 2,887 enrolled Colville members in 1954. Thus, to accept the argument urged by Colville would result in the majority benefiting from the treaty rights of a minority with a resulting proportionate loss of fishing rights to The Yakima Nation and Nez Perce tribes, both of whom have well established and highly organized off-reservation fishing regulatory authority.[20] As the law governing Indian treaties clearly underscores, treaty rights belong to tribal entities, not to individuals within the tribe. I find that the tribal entities which are reflected in the Yakima and Nez Perce treaties of 1855 are the present day Confederated Tribes and Bands of the Yakima Indian Nation and the Nez Perce Tribe of Idaho. While it is well established that individual members of a tribe or band retain personal rights regardless of their residence, their presence within a reservation or, as in this case, enrollment in another confederacy cannot result in a transfer of rights to the entire community. I conclude that the Nez Perce Tribe and Confederated Tribes and Bands of the Yakima Nation are the only duly recognized *1571 "tribal" organizations that may administer or regulate the exercise of fishing rights by treaty tribe members.[21]
Next, it is with the recognized limitations set forth in my "introduction" that I approach the factual issues regarding Moses' treaty negotiations with the federal government. Although I find that Sprague's conclusions regarding Moses' plans and intentions are to some degree speculative and lack substantial evidentiary support, I also find insufficient evidence to convince me that Moses, as the only recognized leader of the Wenatchi, Entiat, Columbia and Chelan at the time the treaties were negotiated, either bargained for or sought to reserve off-reservation fishing rights. In the treaties negotiated by Moses in 1879 and 1883, he clearly sought to establish rights to land in the traditional aboriginal territories of the Chelan, Entiat and Wenatchi, but no mention was made of fishing rights, nor was the Yakima treaty of 1855 referenced or incorporated. I find that the Wenatchi, Entiat, Chelan and Columbia Indians who moved to the Colville Reservation followed Moses and refused to be bound by the 1855 treaty. Moses and his followers deliberately sought to separate themselves from the "Yakima Nation" identified in the treaty. Thus, although many current members of the Colville Confederacy are descendants of groups identified as belonging to part of the Yakima Nation within the 1855 treaty, Colville has failed to establish that those descendants are entitled to exercise rights reserved to the Wenatchi, Entiat, Chelan and Columbia who signed the treaty as part of the "Yakima Nation."
The Palus appear to have shared a similar primary concern of maintaining their tribal territory. Although at least one member of the Palus signed the Yakima treaty, subsequent meetings between Palus leaders and the government focussed upon land rights. Further, more than other tribes, prior to their movement to the Colville Reservation, members of the Palus appear to have been loosely connected, grouped mainly on the basis of their geographic location around the Snake River rather than upon a cohesive political structure. Based upon the evidence, I conclude that although a number of Palus moved to the Colville Reservation and maintained certain tribal traditions while there, the evidence is insufficient to show that the Palus moved "as a tribe."
According to Verne Ray, the Chief Joseph Band of Nez Perce appears to have maintained an independent "band" identity and territorial separation that were unique and distinct from all other bands of the Nez Perce. Although represented by Old Joseph at the Walla Walla negotiations in 1855, the Chief Joseph Band withdrew from any further political cohesion with the remaining Nez Perce bands at least as early as 1863, with their refusal to acknowledge the treaty signed by 51 other Nez Perce. Like Moses, Chief Joseph opted to disassociate his band from the others in order to maintain their traditional tribal territory and, eventually, to negotiate his own treaty to enable his band to return to the Northwest. I find that the Chief Joseph Band that moved to the Colville Reservation was distinct from and no longer a part of the "Nez Perce Tribe" which exists as a distinct entity today and which I find is the recognized administrator of rights reserved in the 1855 Nez Perce treaty.
Finally, to the extent that individual members of the Colville Confederacy seek to pursue treaty fishing rights, they are free to do so through the Yakima Nation and Nez Perce Tribe, the administrators of the 1855 and 1867 treaty rights at issue. I recognize the practical problems that such a suggestion creates based upon current Yakima and Nez Perce enrollment ordinances which require members to be enrolled in the tribe to exercise rights and which provide that no member may also be an enrolled member of another tribe. However, regulation of individual fishing *1572 rights within the tribe is a matter within the exclusive jurisdiction of the Yakima and Nez Perce Tribes and any amendment to their enrollment ordinances should be sought through those tribes.

CONCLUSION
In 1855, two distinct groups were singled out from within the Indian Community as the recognized holders of fishing rights reserved under the Yakima and Nez Perce treaties. The leaders, Kamaiakun and Lawyer, were recognized as the primary spokesmen for the "Yakima Nation" and the Nez Perce Tribes respectively. Unlike land rights, allotments or monetary compensation for the loss of land or resource mismanagment, fishing rights are a unique natural commodity. Tribal fishing rights may not be apportioned individually; they may not be bartered, transferred and they do not accrue interest  their value is indeterminate, and, for many Indians, these rights are priceless symbols of cultural and religious traditions. In order for the various treaty tribes to function together and share the fish "in common with the citizens of the Territory," the government necessarily had to look to some defined person or group within the Indian Community. I find that those treaties, and the judicial decisions which have struggled with their interpretations, have sought to achieve a system which recognizes an organized tribal structure as the administrator of rights reserved under the treaties in the form and substance which most closely resembles the framework envisioned by the treaties. I find the the administrators of those rights, as reflected in the 1855 treaties, are The Confederated Tribes and Bands of the Yakima Indian Nation and The Nez Perce Tribe of Idaho.
Based on the foregoing, I find that the Colville Confederated Tribes has failed to establish that it is the successor Indian government and the present day holder of treaty rights reserved to the Wenatchi, Entiat, Chelan, Columbia, Palus, or Chief Joseph Band of Nez Perce in the treaties of 1855 with the Yakima Nation or with the Nez Perce. Accordingly, the Colville complaint in intervention is dismissed.

APPENDIX 1

Nez Perce Agreed Facts

I. TRADITIONAL NEZ PERCE POLITICAL ORGANIZATION
1. The traditional Nez Perce political organization was comprised of villages, bands, band groups and the tribe. Villages were the smallest unit of government. Villages were often comprised of family or extended family groupings. Multiple villages combined together to form bands. Villages and bands were often identified with a particular river drainage. For certain purposes, bands would join together to form a band group. Collectively, all were included within the designation as the Tribe.
2. Best estimates are that there were approximately 16 or 17 Nez Perce Bands, 100 to 130 villages and numerous camps within the Nez Perce Tribe in the time period around 1855. These camps, villages, bands and the total Nez Perce territory they occupied, are identified on Exhibit A[1]. Between 1806 and 1860 population estimates for the Nez Perce Tribe fell between 1,700 to 8,000.
3. The traditional Nez Perce political organization which existed long into pre-historic times was one of flexible structure, adaptable to a variety of purposes. Leadership was established based largely upon an individual's performance of relevant acts and acceptance of that person as a leader by individuals for that particular purpose.
4. Within each level of political structure there were multiple leaders each of whom exercised general authority over activities that required governmental action at the respective levels of organization. For example, there were leaders recognized for activities such as warfare, hunting, fishing, religion, conflict resolution, healing and other specific activities within each village, band, band group and on a tribal wide *1573 basis. A spokesperson would often confer with a council and carry out the decisions made at council.
5. Villages, bands, band groups and the tribe each had defined functions within the tribal structure and each acted as necessitated by the particular situation. For example, food gathering was an activity that was generally done at the village level with an individual accepted as the leader for that activity. Hunting buffalo on the plains of what is now Montana and Wyoming was often done by band groups of the tribe because it required military strength for protection as well as enough people to engage in hunting and processing animals. Major acts of warfare were typically a tribal activity.
6. Villages and bands each occupied identifiable territories that collectively comprised the tribal territory. Leaders at the village, band and tribal levels exercised relatively independent authority over the areas for which they were recognized as leaders. There was no line of authority or chain of command that allowed a leader on one level to overrule or dictate to a leader at a different level and no band, village or other group could be forced to participate in any activities. Leadership was established largely by consensus of the governed. If there was disagreement within the band or village it is likely those wishing to participate would and those who did not, would not. However, in certain contexts such as buffalo hunting, intertribal agreements and war, where quick, decisive action was necessary, a leader could act without consultation.
7. Leaders at all levels would be advised by councils of other prominent individuals from the particular village, band or band groups and, at the tribal level, by a council composed of prominent band leaders.
8. There is historical evidence, beginning with the records of Lewis and Clark in 1805, that there were individuals who held the position of head chief over the entire Nez Perce Tribe. Ellis was recognized by the federal government in this capacity from 1842 until his death. For a period following Ellis' death, there is no official record of a federally recognized head chief. Lawyer was later recognized by the federal government as head chief.
9. Old Joseph was one of the leaders of a band of Nez Perce known as the Wal?wama band which was located generally in the area now known as the Wallowa Valley in northeastern Oregon. The written record primarily identifies Old Joseph and later his son Young Joseph as spokes-persons for the Wal?wama Band consistent with traditional Nez Perce political organization.
10. Beginning at least as early as the 1830's, the Nez Perce had demonstrated an interest in Christianity and Christian missionaries. By the 1840's a division between Christians and non-Christian factions was evident in the Tribe.
11. During the negotiation of the treaties of 1855 and 1863 the Christian and non-Christian factions were evident.
12. The effects of this Christian and non-Christian division within the Tribes figured in the War of 1877 as well as in Oklahoma among the non-treaty survivors of the war. It was evident in the events surrounding the return of these survivors to the Northwest in 1885.

II. TREATY OF 1855 (12 STAT. 957)
1. The primary purpose of the 1855 Treaty was to extinguish Indian title to certain land and to confine tribal people upon a defined tract of land while, at the same time, insuring that the traditional hunting, fishing, gathering and pasturage activities could take place as before, including sites both on and off the reservation. The Treaty confirmed Nez Perce title to lands and the resources upon them and recognized the tribe's sovereignty, leaders and government.
2. The Treaty of 1855 was not intended to, nor did it, abolish or abrogate the traditional Nez Perce form of political organization as it existed prior to 1855, nor did it abrogate or abolish the sovereignty of the Nez Perce Tribe.
*1574 3. The minutes of the treaty council proceedings held at Walla Walla where the 1855 Treaty was negotiated, indicate that the "following named cheifs (sic), delegates and head men present at the Council, and representing their respective tribes and bands of Indians as below stated. For the Nez Perses (sic): Lawyer, Joseph, U-u-sune-mal-e-can, James, Timothy, Red Wolfe, Spotted Eagle, Three Feathers, Jason, Jacob, Cow-pook, Is-coh-tim, Kay-kay-map, Tu-per-lan-its-a-kum, Billy, Toh-ton-mol-e-wot, The Snipe, Bold Eagle, and others."
4. Fifty Four individuals signed the 1855 treaty on behalf of the Nez Perce Tribe. Lawyer signed first and Old Joseph signed third.
5. Aboriginal Nez Perce lands comprising some 5.5 million acres were ceded to the United States by this treaty. A reservation was created under its terms that encompassed approximately 7.5 million acres.
6. The federal government viewed the treaty as binding on the members of all villages and bands of the Nez Perce Tribe.

III. TREATY OF 1863 (14 STAT. 647)
1. The primary purpose of the 1863 treaty was to secure the relinquishment of approximately 90% of the land reserved by the Nez Perce Tribe in the 1855 treaty. The effect was to reduce the size of the Nez Perce reservation from 7.5 million acres to approximately 750,000 acres.
2. From the United States' perspective, this was required as a result of substantial unlawful non-Indian use and occupancy of large portions of the 1855 reservation and the government's inability to adequately protect that reservation against such encroachment. This invasion resulted primarily from the discovery of gold on the Nez Perce Reservation and the desire of the non-Indians to exploit other valuable natural resources located thereon.
3. The 1863 Treaty was negotiated with Lawyer, as head chief and other leaders of the Nez Perce Tribe. This Treaty was initially resisted by most tribal leaders and there was a delay in the execution of the treaty by tribal representatives because of this dissatisfaction. Fifty one individual tribal leaders signed the 1863 treaty on behalf of the Nez Perce Tribe and it appears that at least twenty of them had been signers of the 1855 Treaty.
4. Dissatisfaction with the terms of the 1863 Treaty resulted in some leaders refusing to sign it. A majority of those who refused to sign were leaders of villages and bands situated partly or wholly outside the proposed boundaries of the reservation that would be created by this Treaty although others situated within those boundaries also opposed it. Likewise, representatives of bands and villages with and without the proposed reservation also supported it.
5. Old Joseph did not sign the 1863 Treaty. He is reported to have been so angry with that treaty that he ripped the Treaty into shreds along with his new testament. The territory of the Wal?wama Band was all located outside the boundaries of the Reservation reserved in the 1863 Treaty.
6. Consistent with the general Indian treaty negotiation policy of the United States, the United States fully expected that all Nez Perce people, including those whose leaders did not sign the 1863 Treaty, would be located on the 1863 reservation.
7. In light of the Treaty reserved rights to hunt, fish and gather food and pasture their horses outside the 1863 reservation, the United States considered the 1863 reservation as being of an adequate size and containing quite adequate resources to accommodate permanent homes for all Nez Perce including those who resided outside its boundaries prior to 1863.
8. There is nothing contained in the 1863 Treaty that affected the rights reserved or set out in the 1855 Treaty except for the reduction in the size of the 1855 reservation.
9. The Nez Perce Tribe was also a party to a third Treaty in 1868 (15 Stat. 693) which was signed by three individuals on behalf of the Nez Perce Tribe and an agreement with the United States dated *1575 May 1, 1893. Neither of these documents contain provisions of any relevance to the issues in this case.

IV. JOSEPH
1. Old Joseph, who had signed the 1855 Treaty and had been involved in the 1863 negotiations, died in 1871.
2. After his death, his son, known as Young Joseph, assumed a leadership role in the Wal?wama band. Consistent with the traditional political structure, his area of leadership was in civil matters as opposed to military. His brother, Ollicut, also assumed a leadership position but in military matters and that leadership was exercised in the course of the Nez Perce war although he was not the principal military leader in the war. Looking Glass and Toohoolhoolzote were the principal military leaders until their deaths. Other members of the band would have assumed leadership roles with respect to specific tasks or in response to specific conditions consistent with Nez Perce tradition. In dealings with the United States, Young Joseph as his father Old Joseph, was considered to be the principal spokesperson of the Wal?wama Band.

V. EXECUTIVE ORDER OF 1873
1. On June 16, 1873, a reservation was created by Executive Order in the Wallowa Valley for "the roaming Nez Perce Indians." The Wal?wama band was among the "roaming Nez Perce Indians" for whom this reservation was created as were the Alpowama Band, the Lamtama Band and others.
2. The 1873 reservation is depicted in Exhibit B.
3. The 1873 reservation was not accepted by either the "roaming Nez Perce" or non-Indians. Because, among other things, it did not include all of the territory considered to be necessary by the "roaming Nez Perce", including the Wal?wama Band, they ignored the specific boundaries of the reservation and continued to follow their traditional gathering patterns which involved lands within and without the 1873 reservation. There was opposition from some of the "roaming Nez Perce" like Lamtama and the Alpowama Bands because their traditional lands were not included within the 1873 reservation. The governor of the Oregon Territory expressed vigorous opposition to the proposed reservation on behalf of his non-Indian constituents in the Wallowa area and caused its withdrawal according to some historians.
4. The 1873 reservation contained part, but not all, of the traditional territory of the Wal?wama band of Nez Perce and none of the territory of other displaced Nez Perce bands.
5. The Executive Order that created the 1873 reservation was rescinded in 1875.
6. The Executive Orders of 1873 and 1875 did not affect rights reserved or set out in the Treaties of 1855 or 1863.

VI. NEZ PERCE WAR OF 1877
1. Between 1863 and 1877, the Wal?wama and other bands continued to reside off the reduced Nez Perce reservation in their traditional territory. In May of 1877, Joseph, along with other leaders of Nez Perce bands residing off the reservation, met with General Howard and agreed to move to the Nez Perce reservation. Joseph, and leaders of other bands, had identified lands within the 1863 reservation where they would move.
2. Since 1863, members of the Wal?wama Band had been involved in conflicts with non-Indian settlers in the Wallowa Valley that resulted in deaths. In June of 1877, while attempting to move to the Nez Perce reservation, the Wal?wama and other bands were implicated in violence against non-Indians that has been identified as triggering the Nez Perce War. Joseph and the Wal?wama Band were not responsible for, nor did they participate in, that initial violence. The Wal?wama Band was a participant in the war. Other factors contributing to the conflict included white encroachments on Indian lands, influence of the Dreamer Religion and growing Indian dissatisfaction with the federal government's policies toward the tribes of *1576 the northwest. This was the period of major conflicts between Indians and the United States.
3. The warring Nez Perce included at least five bands, one of which was Palus, and some individuals from other tribes including Palus, Cayuse and Umatilla, who joined the war and participated to varying degrees.
4. In the course of the war, Nez Perce war leaders including Looking Glass, Toohoolhoolzote, Hahtalekin, Ollicut and others, were killed. In the absence of war leaders, Joseph along with remaining leaders from other bands assumed responsibility for what remained of the war.
5. The Nez Perce war continued until October 1877 when Joseph surrendered to General Nelson Miles in the Bear Paws Mountains in Montana. General Miles promised that the surrendering Nez Perce could move to the Nez Perce reservation.
6. The number of Nez Perce who surrendered are estimated at 418, representing 87 men, 184 women and 147 children. A total of 96 Nez Perce men, women and children had been killed in the course of the war.
7. At the end of the war, White Bird, principal leader of the Lamtama band, along with 140 men and boys and 93 women and girls, and some members of other bands, escaped to Canada. A few other individuals may have escaped to different Indian reservations in the northwest and plains. Others were killed by hostile tribes. The remaining warring Nez Perce were sent to Oklahoma contrary to the promises made to Joseph at the time of surrender. In subsequent years, a significant number of those people who escaped to Canada or elsewhere returned to the Nez Perce reservation in Idaho.
8. While in Oklahoma, Joseph and Yellow Bull continued in the role as spokesmen for the Wal?wama Band and those of the Lamtama band that did not escape with White Bird to Canada, respectively, and possibly other individuals. There appear to have been survivors from three or perhaps four Nez Perce bands, including the Wal?wama Band. In addition, there were individuals of other tribes including some Palus people in Oklahoma as a result of the Nez Perce war.
9. In 1883 approximately 30 Nez Perce women and children from various bands were allowed to return to the Nez Perce reservation with James Reuben.
10. The numbers of Nez Perce in Oklahoma by 1885 had been reduced to approximately 268 because of the hostile environment in Oklahoma to which they were not acclimated and because of disease.
11. Approximately one half of the Nez Perce people in Oklahoma accepted Christianity before they returned to the Northwest in 1885. Although some members of the Wal?wama Band accepted Christianity, the Wal?wama Band was one of the least affected by Christianity and most of its members retained their traditional beliefs.
12. In 1885, as a result of the negotiations of Joseph, leaders on the Nez Perce reservation as well as sympathetic non-Indians, the remaining survivors of the Nez Perce war who had been sent to Oklahoma were allowed to return to the Northwest.
13. Upon their arrival in the northwest the group divided into two groups  those that would go to the Nez Perce reservation and those that would go elsewhere. Agents of the United States had determined it inadvisable for Joseph to return to the Nez Perce reservation because of outstanding indictments against him resulting from the war. Christian leaders also feared his return to the Nez Perce reservation would result in organized resistance to christian influence on the reservation. Joseph had hoped to be able to return to his traditional territory in the Wallowa Valley and he hoped any movement to Colville Reservation to be temporary.
14. Joseph, Yellow Bull and others were initially sent to Fort Spokane. Joseph and his followers moved onto the Colville Reservation at Nespelem, at the invitation of Chief Moses and Tonasket. Yellow Bull and twelve of the sixteen people who had moved with him to Fort Spokane eventually moved to the Nez Perce Reservation at Lapwai. The move of Joseph and his followers *1577 was opposed by the Sanpoil, Nespelem and others who viewed them as interlopers. Military troops were summoned by Agent Gwydir to help enforce the settling of the Nez Perce at Colville.
15. Of the 268 people who returned to the Northwest in 1885, 150 moved to Fort Spokane, and then onto the Colville Reservation and 118 returned to the Nez Perce reservation. These numbers did not remain constant in subsequent years as people felt free to move at will.
16. The division of Nez Perce in 1885 between the Nez Perce and Colville reservations is not precise. A substantial number of people who went to Colville with Joseph were part of the Wal?wama band although some followers of Joseph went to the Nez Perce reservation and some people who went to the Nez Perce reservation may have subsequently elected to go to the Colville reservation.
17. In subsequent years, Joseph visited the Nez Perce reservation and also visited the Wallowa Valley but did not move off of the Colville Reservation. He died there in 1904.

VII. NEZ PERCE ON COLVILLE RESERVATION
1. The Nez Perce that came to the Colville Indian Reservation with Chief Joseph in 1885, as well as Nez Perce that may have arrived on the Colville Reservation subsequent to that time have been collectively characterized and referred to by some as the Chief Joseph Band of Nez Perce and by others as the Colville Nez Perce.
2. In part, because they were initially settled and assigned allotments in the Nespelem area, the Nez Perce on the Colville Reservation generally reside in close proximity to each other in and around the town of Nespelem, which became, and is today the Indian Agency for the Colville Reservation.
3. A series of 38 Congressional appropriations passed between 1884 and 1923 refers to appropriations for the Chief Joseph Band of Nez Perce on the Colville Indian Reservation.
4. During his life on the Colville Reservation, Chief Joseph was considered by the United States to be the leader of the Chief Joseph Band of Nez Perce on the Colville Reservation. Upon Chief Joseph's death, leadership of the Chief Joseph Band of Nez Perce succeeded to Albert Waters, followed by Crow Blanket, followed by David Williams through the 1930's.
5. After Chief Joseph's death in 1904, the familiar characterization of the Nez Perce on the Colville Indian Reservation has been the "Chief Joseph Band of Nez Perce".
6. The Nez Perce on the Colville Reservation, and the leaders and chiefs of the Chief Joseph Band of Nez Perce joined with other leaders as outspoken opponents of efforts to organize the Confederated Tribes of the Colville Reservation during the 1930's, were opposed to organization under the Indian Reorganization Act, and were opposed to the ultimately approved constitution and bylaws formalizing the Confederated Tribes of the Colville Reservation. However, since the creation of the Colville Confederated Tribes, Nez Perce people have occupied prominent positions within the tribal government, including the office of tribal chairman.
7. The Chief Joseph Band of Nez Perce was specifically identified in United States correspondence as a group on the Colville Reservation eligible to vote on whether to accept the Indian Reorganization Act for purposes of organizing the government for the Confederated Tribes and Bands situated on the Colville Reservation.
8. The Chief Joseph Band of Nez Perce has consistently been referred to by the United States as one of the constituent bands of the Confederated Tribes of the Colville Reservation.
9. The Nez Perce people on the Colville Reservation have maintained to a high level, their Nez Perce language; specifically instruct their children in Nez Perce customs and culture; and, have maintained a close community and unity on the Colville Reservation. In so doing they have maintained close contact and relationship with *1578 the Nez Perce on the Nez Perce Reservation and other Sahaptin groups at Yakima and Umatilla, as evidenced in their ceremonial life and pattern of marriage.
10. The Nez Perce maintain a separate Nez Perce Longhouse on the Colville Reservation located at Nespelem. There is also a specifically designated Nez Perce Cemetery, where Chief Joseph is buried, and where Nez Perce people are customarily buried.
11. The organization of the government of the Colville Confederated Tribes does not distinguish Bands as having separate power, or privilege or representation on the Tribal Council. Representation is by district and the Colville Nez Perce have been located in an area aboriginally owned by the Sanpoil Nespelem.
12. In response to a specific request made by the Nez Perce in discovery, the Colville Confederated Tribes prepared an updated list of persons enrolled in the Colville Confederated Tribes who have Nez Perce blood. That list is Exhibit C. The Colville Confederated Tribes and Nez Perce agree that the list is an accurate reflection of the Colville Confederated Tribes records. However, the Nez Perce and Colville Confederated Tribes do not agree on its relevance.
The Colville Confederated Tribes believes that the population of the various Bands in 1991 is not relevant to the question of the existence of treaty fishing rights. It is relevant, if at all, only to show that members can be identified by Band. The population figures may be relevant to questions that may later arise as to who can fish and where.
The Nez Perce Indians believe that the document is relevant to give the Court a perspective on the relative size of the Colville Nez Perce to the Confederated Tribes and the Nez Perce Tribes (Idaho), and is relevant to the issue of continuity.
As such, the Colville Confederated Tribes reserves the right to object to the use and admissibility of the 1991 population figures.
Consistent with the above reservation of rights, the list identifies 502 members of the as being Colville Nez Perce. Eighty nine (89) are less than ¼ degree Nez Perce blood, 413 are ¼ degree Nez Perce or greater, and 44 are full blood Nez Perce. According to Colville Tribal enrollment records 169 of the 502 have current mailing addresses that show an off Reservation address. The total tribal population for the Colville Confederated Tribes as of 1991 is 7,585, and for the Nez Perce Tribes is 3,920. All of the persons shown in Exhibit C are enrolled members of the Colville Confederated Tribes.
13. A person may be enrolled as a member of the Colville Confederated Tribes if they have one-quarter (¼) degree of Indian blood from any combination of the eleven tribes that comprise the Colville Confederated Tribes.
14. Exhibit D is a list that depicts which tribal backgrounds are represented by the "other" blood quanta shown on Exhibit C.
15. To be a member of the Nez Perce Tribe a person needs to have ¼ degree blood of Nez Perce. As a result, Nez Perce members are not all full blood Nez Perce, some have non-Indian blood and others have Indian blood from other Indian tribes.
16. To retain membership in the Nez Perce Tribe a person does not have to reside on the Nez Perce Reservation, and members of the Nez Perce Tribe do reside off the Nez Perce Reservation.
17. The Nez Perce Tribe's enrollment Ordinance allows persons who are at least one-quarter (¼) degree Nez Perce blood and who are not members of any other tribe to become enrolled in the Nez Perce Tribe.
18. Bands are no longer of significance in the Nez Perce political structure. Tribal government is now conducted under a federally approved Constitution and By-Laws by the Nez Perce Tribal Executive Committee, the nine members of which are elected from the tribal membership at large.
*1579 19. As a result of the interrelationship between tribes on the Plateau, there are some members of modern tribes who would also qualify for membership in another modern tribe.

APPENDIX 2

Colville-Yakima Agreed Facts

AGREED FACTS
1. The Chelan, Wenatchi, Entiat, Columbia and Palus Tribes were each party to the Yakima Treaty of June 9, 1855 which was entered into a Walla Walla, Washington, territory.[1]
2. The Yakima Nation which was created by and named in the preamble to the Treaty of 1855 is not synonymous with the Yakima Tribe and does not exist as an entity today.
3. The Chelan, Wenatchi, Entiat, Columbia and Palus Tribes and the Kittitas, Wanapam, Yakima, Klickitat, Wishram, and Skeen Tribes are successors to the "Yakima Nation" identified in the preamble to the 1855 Treaty.
4. There was no movement as a tribe by either the Chelan, Wenatchi, Entiat, Columbia or Palus Tribes onto the Yakima Reservation although individual members of the tribes did move to that reservation.
5. A significant number of Indians who were members of the Chelan, Wenatchi, Entiat, Columbia or Palus Tribes moved onto the Colville Reservation.
6. The Colville Tribes represent the tribal interests of the Chelan, Columbia, Wenatchi, Entiat and Palus tribes for the purpose of allocating the monetary damage award for undercompensated lands under the Treaty of 1855.
7. The Confederated Tribes of the Colville Reservation and the Confederated Tribes and Bands of the Yakima Nation are both federally recognized Indian tribes.
8. The Confederated Tribes of the Colville Reservation governs under a Constitution and Bylaws ratified on February 26, 1938, and approved by the Commissioner of Indian Affairs on April 19, 1938.
9. The Constitution and Bylaws of the Confederated Tribes of the Colville Reservation is silent with respect to the treaty rights now claimed by Colville.
10. The Commissioner's approval of the Colville Tribal Constitution and Bylaws states as follows: "This Constitution and Bylaws having been proposed and duly ratified by the Indians of the Colville Reservation on February 26, 1938, at a referendum called by me, is herewith approved." signed John Collier, Commissioner of Indian Affairs.
11. The 1872 Executive Order establishing the Colville Reservation is silent as to off-reservation fishing rights.
12. The Colville Reservation was set aside by Executive Order on July 2, 1872 for "said Indians and for such other Indians as the Department of Interior may see fit to locate thereon".
13. The enrollment of the Confederated Tribes of the Colville Reservation is approved by the United States Bureau of Indian Affairs.
14. The Confederated Tribes of the Colville Reservation exercises aspects of sovereignty over its territory through its Tribal institutions that provide services including, but not limited to law enforcement; trial and appellate courts; probation and parole services; child welfare protection; management of fish and game including operation of the Tribal hatchery; social welfare including alcohol and drug treatment; adolescent residential care; basic and higher education services; care of the elderly; mental health counseling; and, protection of the environment including protection of water, and air, zoning, and land use regulation.
15. In Indian Claims Docket 181-C, the Colville Confederated Tribes sought compensation for damages suffered to fishing *1580 rights on or adjacent to the Colville Reservation.
16. Kettle Falls was a primary fishery for the aboriginal Colville, Lake, Nespelem, San Poil and Okanogan as well as others. These tribes also had significant fisheries at other locations on or adjacent to the 1872 Colville Reservation.
17. There is no federal enrollment statute which sets forth the criteria for enrollment in the Colville Confederated Tribes; criteria is set forth in the Colville Confederated Tribes' federally approved Constitution.
18. Enrollment in the Colville Confederated Tribes is determined pursuant to amendments III, V, and IX, to the Colville Tribal Constitution, all of which have been approved by either the Commissioner of Indian Affairs or the Secretary of Interior.
19. The Yakima Nation has an Enrollment Act (25 U.S.C. § 601 et seq.) passed by Congress that governs enrollment in the Yakima Nation.
20. John Harmilt was a Chief of the Wenatchi.
21. In 1896, the United States Government purchased the lands of the Wenatshapam Fishery reserved under Article X of the Yakima Treaty. The funds from that purchase were used to develop the Yakima Indian Reservation irrigation project and to provide direct payment to Wenatchi Indians who lived at or near the Wenatshapam Fishery. The agreement for the purchase of the Wenatshapam Fishery also included provision to allot the Wenatchi Indians living at or near the sale of the Wenatshapam Fishery in the area of the fishery on the Wenatchee river.
22. In the 1930's many chiefs and Indian elders on the Colville Reservation were opposed to the proposed change from a traditional Indian method of choosing leaders and government and the organization of a new governmental structure on the Colville Reservation.
23. At the time of the confederation of tribes on the Colville Reservation, John Harmilt had an allotment on the Colville Reservation and a homestead near Cashmere, Washington where he died.
24. The United States appropriated funds to assist in the removal of the Wenatchi people to the Colville Reservation. A portion of these funds was spent to improve Wenatchi homesteads near Cashmere, Washington.
25. After the 1883 Agreement negotiated by Moses, Tonasket, Sarsarpkin and Lot, returning the Moses Reservation to the public domain and allowing Moses and his people to move to the Colville Reservation or accept allotments on the former Moses Reservation, the Chelan refused to accept allotment on the former Moses Reservation or to initially move to the Colville Reservation. Later, the Chelan people were forcibly moved to the Colville Reservation and their leaders, including Chief Long Jim, were briefly jailed.
26. Chief Long Jim, after being forced to go to the Colville Reservation, and following his release from jail on the Colville Reservation returned to the former Moses Reservation and ultimately received an allotment on the former Moses Reservation.
27. Entiat tribal members received allotments on the former Moses Reservation pursuant to the terms of the 1883 Agreement returning the Moses Reservation to the public domain.
28. In 1878 an agreement was reached with Chief Moses, which agreement was ratified by Congress on April 19, 1879 where a reservation (Moses Reservation) was established for Moses and his people.
29. The Moses Reservation ratified by Congress eventually included the aboriginal Chelan territory, and was adjacent to the aboriginal territories of the Columbia, Entiat and Wenatchi.
30. Chief Moses was the chief of the Columbia and was recognized and treated by the United States as the leader and spokesperson for the Wenatchi, Entiat, Columbia and Chelan with substantial authority with respect to them, not all of them acknowledged Moses as their leader.
31. The United States negotiated with Chief Moses as the representative of the *1581 Wenatchi, Columbia, Entiat, and Chelan for the purpose of setting aside a separate reservation within the territory of each.
32. The reservation originally requested by Chief Moses included some of the territory of the Wenatchi, Columbia, Entiat and Chelan, but was not approved by the United States.
33. In 1883, Chief Moses along with Chiefs Sarsarpkin, Lot and Tonasket negotiated with the United States to restore the Moses Reservation to the public domain and allow Moses and his people, whom Moses and the United States understood to include Chelan, Wenatchi, Entiat and Columbia to either take allotments on the Moses Reservation or remove to the Colville Reservation.
34. Moses had wives from several different tribes. This practice of marriage was a part of the Plateau culture. It is likely that Moses spoke and understood several Indian languages and some English.
35. Moses was on friendly relations with General Howard, with whom he corresponded in letters written in English over a number of years. It is likely that they considered each other friends.
36. Moses took three trips to Washington, D.C., where he negotiated both with the president of the United States, the Secretary of the Interior and the Department of the Army.
37. The movement of Moses and his people onto the Colville Reservation following the 1883 Agreement was opposed by many other Indians already resident thereon, particularly by the San Poil and Nespelem.
38. The resentment against Moses and his people moving onto the Colville Reservation in 1883 carried on for many years.
39. The 1879 Order establishing the Moses Reservation, the 1880 Executive Order enlarging the Moses Reservation to include all of Lake Chelan, the 1883 Agreement eliminating a fifteen (15) mile strip on the northern boundary of the Moses Reservation and the 1883 Agreements all negotiated by Moses as spokesman for his people are silent on the issue of any rights retained in any treaty with the United States.
40. The Palus spoke Sahaptin.
41. At the time of the 1855 Treaty, the village was the principal political unit of the Wenatchi, Columbia, Entiat Chelan and Palus.
42. Villages along the same watercourse generally had a common language and customs and people from the villages would interrelate for some purposes.
43. Those Indians who would be able to exercise treaty fishing rights as a result of this case are enrolled members of the Colville Confederated Tribes.
NOTES
[1] A special note of appreciation to Mr. George Dysart, retired counsel for the United States and a former active participant in United States v. Oregon for many years, for his review of this decision and notes of technical corrections.
[2] The historical background of United States v. Oregon, Civ. No. 68-513, is also set forth in my Amended Opinion of Oct. 7, 1988, adopting the 1988 Columbia River Fish Management Plan. 122 F.R.D. 571.
[3] In Puyallup, the Supreme Court declared that the Indians' right to fish at their usual and accustomed places could not be qualified by the State, but that the State could regulate the manner and size of the Indians' commercial take in the interests of conservation. 391 U.S. at 398, 88 S.Ct. at 1728.
[4] Although I felt bound by this finding, I note that it is somewhat misleading since the "Yakima Nation" referenced in the Treaty of 1855 has never existed.
[5] These agreed facts are attached as Appendix 1 to this opinion.
[6] The term "band" within the area of the Northwest Interior Plateau is defined by ethnographers as a "principal village together with its satellite villages." Gary Palmer, Direct Testimony, at Part 1-3.
[7] This is also true of Chief Moses and the Palus, discussed infra.
[8] Old Joseph did not attend the negotiations in 1863 given his failing health. However, Young Joseph, his son and successor, attended on behalf of the band. Ray, Ethnohistory of the Chief Joseph Band of the Nez Perce: 1805-1905, p. 20.
[9] In W.W. Woolverton v. U.S., 29 Ct.Cl. 107 (1894) the court found that the Chief Joseph Band of Nez Perce ceased to be a part of the Nez Perce Tribe and was not entitled to monetary benefits under treaty provisions with the Nez Perce tribe.
[10] These agreed facts are attached as Appendix 2 to this opinion.
[11] I note at the outset that there exists a degree of uncertainty in the specific identification of Indians by tribal designation, given that certain tribes inter-married extensively. For example, as Gary Palmer points out, Verne Ray experienced some difficulty in his attempt to identify villages as that of the Wenatchi, Chelan, Entiat and Methow in his 1936 Report. Palmer, Direct Testimony, at p. 3-2, and 4-1.
[12] According to Ray, the Columbia Confederacy was first headed by Moses' father, Shooktalkoosum, who was part Okanagan and part Chelan, but whose chieftainship began with the Columbia Indians. Ray, Columbia Confederacy, at p. 774 & 785.
[13] However, as Ray explains, no minutes were taken and no official record was kept of the negotiations which took place with Kamaiakun and others on June 8 and 9, 1855. Verne Ray, Tribes of the Columbia Confederacy and the Palus, p. 40 (1971). However, there are official reports of separate negotiations with the Yakimas, in which Kamaiakun took part. Id., at 42-43.
[14] Ray notes that governmental efforts were only partially successful with the Wenatchi who were offered homesteads in their own territory and who shared close ties with the Kittitas. Columbia Confederacy, at p. 786.
[15] Separate reservations were later set up for the Calispel, Spokan and Coeur d'Alene.
[16] However, I note that even this simplistic definition of a "tribe" is subject to a degree of modern interpretation and extrapolation that is ill-suited in its application to Indian political structure. See Ray, Native Villages and Groupings, at pp. 111-113 and Wilkinson, American Indians, Time and the Law, at 77 (Yale University Press 1987) ("Tribalism is ultimately a matter of self-definition ... tribalism continues until the members themselves extinguish it"). However, it is the only term of art available under the law and further is the definition which I am bound to apply under the law of this Circuit.
[17] Although Judge Boldt relied, in part, upon government recognition as a factor, I recognize that government recognition is not determinative of treaty rights. United States v. Washington, 641 F.2d at 1371.
[18] In addition, the court noted that the Wahkiakum Band was neither a signatory to nor a political successor to any ratified treaty. Id., at 180 n. 11.
[19] In the earlier proceeding before Judge Boldt, the court determined that the present day Duwamish tribal organization did not hold fishing rights reserved to the Duwamish Tribe which signed the treaty. Id., at 775, n. 8 citing Washington, 476 F.Supp. at 1104-5.
[20] In Judge Boldt's original decision, he describes the Yakima Nation as "a party to the treaty with the Yakimas." It is recognized by the U.S. as a currently functioning Indian tribe composed of the tribes and bands consolidated into the Yakima Nation by that treaty and maintaining a tribal government. United States v. Washington, 384 F.Supp. at 379-382. Further, the term "treaty tribe" as it appears in the decree includes that "Yakima Nation" at paragraph 10, but does not list individual member tribes or bands within that group. Id., at 405-406.
[21] As Charles Wilkinson notes, although the treaties with the Indians are imperfect attempts to "group" previously independent groups or bands of Indians, the treaties did form obligations and are the only legal instruments available to guide courts in making determinations regarding modern day treaty rights.
[1] The map is submitted for purposes of the issues between the Colville Confederated Tribes and Nez Perce Tribe only. The parties do not necessarily agree with the location of each particular village site identified. (Exhibits are not included.)
[1] These allegations are part of the Court's ruling on Summary Judgment. The Yakima Indian Nation does not accept them as "agreed facts", but states that they are an accurate reflection of the Court's Order. This statement applies to Agreed Facts number 1 through 6 as if separately set out in each of those facts.