UNITED STATES of America, Plaintiff–Appellee,

and

The Confederated Tribes of the Warm Springs Reservation of Oregon; Confederated Tribes of the Yakima Indian Nation; Confederated Tribes of the Umatilla Indian Reservation; Nez Perce Tribe; and the Shoshone–Bannock Tribes, Plaintiffs–Intervenors–Appellees,

v.

STATE OF OREGON; State of Washington, Defendants,

v.

CONFEDERATED TRIBES OF the COLVILLE RESERVATION, Plaintiff–Intervenor–Appellant.

No. 92–35150.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 31, 1993.

Decided June 23, 1994.

Alan C. Stay, Nespelem, WA, for plaintiff-intervenor-appellant, Confederated Tribes of the Colville Reservation.

Douglas Nash, Lapwai, ID, for plaintiff-intervenor-appellee, Nez Perce Tribe.

Tim Weaver, Yakima, WA, for plaintiff-intervenor-appellee, Confederated Tribes of the Warm Springs Reservation of Oregon.

Before: BROWNING, SCHROEDER and HALL, Circuit Judges.

SCHROEDER, Circuit Judge:

Appellant is the Confederated Tribes of the Colville Reservation ("Colville"), a confederation of eleven Indian tribes. In 1989, Colville sought to intervene in the underlying litigation that had begun in 1968 to determine Indian off-reservation fishing rights on the Columbia River and its tributaries. In its intervention petition, Colville contended that six of its constituent tribes retained fishing rights as a result of two 1855 treaties. The motion was opposed by other tribes who feared encroachment on their own treaty fishing rights. After considering voluminous exhibits, stipulations and evidence presented during a three-day court trial, the district court denied Colville's intervention motion, finding that Colville could not assert treaty fishing rights reserved to its constituent tribes. 787 F.Supp. 1557. Colville now appeals.

## BACKGROUND

The United States initiated the underlying litigation in 1968 on behalf of certain Indian tribes in Oregon and against the State of Oregon to define, at least in part, the Indians' treaty rights to take fish at "all usual and accustomed places" on the Columbia Riv-

er and its tributaries.[1] The United States takes no position in this appeal.

The controversy before us is part of long-running litigation in the Pacific Northwest regarding Indian rights in both Oregon and Washington under a number of treaties. The historical background of the treaties in the Pacific Northwest is set forth in greater detail in *United States v. Washington,* 384 F.Supp. 312, 334 (W.D.Wash.1974), *aff'd* 520 F.2d 676 (9th Cir.1975) (*"Washington I "*), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), the seminal and most comprehensive opinion in what is now a long line of district and circuit court opinions.

The appellees are the Yakima Indian Nation, The Confederated Tribes and Bands of the Warm Springs Reservation of Oregon, The Confederated Tribes of the Umatilla Reservation and the Nez Perce Tribe of Idaho. These four tribes intervened in the litigation as plaintiffs in 1969. The district court in 1969 ruled that these tribes had treaty rights to a "fair share of Columbia River salmon." *See Sohappy v. Smith,* 302 F.Supp. at 911–12. In 1974 and 1983, the states of Washington and Idaho, respectively, intervened. The district court conducted numerous proceedings that led to the adoption in 1988 of a comprehensive fish management plan.

In 1989, one year after approval of the management plan, Colville sought to intervene. Colville has not explained why it waited over twenty years after *United States v. Oregon* was initiated and why it did not seek to intervene while the district court was considering the comprehensive management plan adopted in 1988. In its intervention petition Colville asserted that it was the legal representative of the Wenatchi, Entiat, Chelan, Columbia, and Palus Tribes and the Chief Joseph Band of Nez Perce. According to Colville, the Wenatchi, Entiat, Chelan, Columbia, and Palus Tribes were parties to the treaty of June 9, 1855, known as the "Yakima Treaty," and the Chief Joseph Band of Nez Perce was party to the Treaty of June 11, 1855 known as the "Nez Perce Treaty." Under both of these treaties, tribes ceded tradi-

tional lands to the United States but reserved off-reservation fishing rights on the Columbia River.

There has been some confusion in this intervention proceeding concerning the scope of Colville's claim. The district court rested its decision in part on its conclusion that Colville's intent was to assert off-reservation fishing rights on behalf of all of its members and all eleven of its constituent tribes, not merely the six tribes who claim descent from treaty signers. At oral argument in this appeal, Colville clarified that it was asserting only the rights of the six constituent treaty tribes, and that accordingly, only members of those tribes would be permitted to fish. In the proceedings here under review, Colville therefore maintains that six of the constituent tribes of which it is the legal representative have off-reservation fishing rights traceable to rights accorded tribes signatory to the treaties.

With that clarification, appellants' principal argument in the appeal rests on two fundamental premises. Colville contends that because the constituent tribes trace their lineage to groups whose representatives signed the Yakima and Nez Perce Treaties in 1855, the constituent tribes retained treaty fishing rights. In support of this contention, Colville points out that the government recognized the constituent groups as tribal entities when they became part of the government of the Colville Confederacy in 1938. Colville contends further that any rights belonging to constituent tribes could not have been extinguished by joining the Colville Confederacy because confederation under the Indian Reorganization Act of 1938 does not abrogate the treaty rights of the confederating tribes. 25 U.S.C. § 476. Thus, Colville argues that it may assert and administer the rights that belong to its constituent tribes.

▉ It is not disputed that Colville is the only entity that can legally act on behalf of members of the Confederated Tribes, and we agree with Colville that if the constituent tribes retained treaty fishing rights, Colville may properly assert these rights. The criti-

---

1.  The underlying litigation was consolidated with *Sohappy v. Smith,* in which individual Indians

asserted the same claims. *Sohappy v. Smith,* 302 F.Supp. 899, 903–04 (D.Or.1969).

cal issue is therefore whether the constituent tribes had treaty fishing rights when they moved to the Colville Reservation and joined the Colville Confederacy in 1938.

## DISCUSSION

The two treaties involved in this litigation were among several treaties that were signed and negotiated by Governor Stevens in the 1850s in a hasty effort to clear land occupied by Indians for development by settlers. The treaties purported to relocate Indians to reservations while recognizing their nomadic subsistence culture by reserving off-reservation fishing rights. *Washington I,* 520 F.2d at 682–83. Governor Stevens, under pressure to extinguish Indian title to all lands, consolidated small tribes or bands into larger tribal entities for the purposes of the treaties. As the district court found, "Indian culture at the time of the Stevens treaties was vastly more complex than the treaties recognized." Further, "to the extent that Stevens made any effort ... to group traditional tribal entities for the purposes of negotiation, his efforts, as reflected in the treaties produced, were woefully inaccurate." The inadequacy of the treaties is further exacerbated by the fact that the Indians signing the treaties generally did not speak English, and the Indian argot into which the treaty provisions were translated was inadequate to convey the meaning of the treaties. *Washington I,* 520 F.2d at 683.

This court recognized in *Washington I* that the treaty tribes were constructed arbitrarily and in haste by Governor Stevens "for his convenience in negotiating the treaties." 520 F.2d at 688. "Nevertheless, each tribe was understood to be an entity for the purpose of each treaty." *Id.* As we explained in *Washington I,* "[e]ach tribe bargained as an entity for rights which were to be enjoyed communally." *Id.* Our court has thus recognized the tribes created by Governor Stevens as the entities receiving treaty rights.

■ Rights under a treaty vest with the tribe at the time of the signing of the treaty, *Washington I,* 520 F.2d at 692, but Indians later asserting treaty rights must establish that their group has preserved its tribal status. *United States v. Washington,* 641 F.2d 1368, 1372–73 (9th Cir.1981) ("*Washington II*"), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). The group seeking to exercise treaty rights must show that it has maintained an "organized tribal structure," which in turn can be shown by establishing that "some defining characteristic of the original tribe persists in an evolving tribal community." *Id.* at 1372–73.

In a series of decisions considering treaty claims of contemporary groups, we have looked to whether tribal continuity has been maintained. In *Washington II,* we considered the claim of a group seeking to assert the treaty fishing rights accorded the Samish Tribe. We held the groups could not assert such rights, basing our holding upon the district court's finding that the appellants "had not functioned since treaty times as 'continuous, separate, distinct and cohesive Indian cultural or political communities.'" *Id.* at 1373 (quoting *United States v. Washington,* 476 F.Supp. 1101, 1105–10 (W.D.Wash.1979)).

In *United States v. Suquamish,* 901 F.2d 772 (9th Cir.1990), we considered the treaty tribe status of a group of the Suquamish who claimed to be the successor to rights originally granted the Duwamish Tribe. We held in that case that a showing of common ancestry was not sufficient and that actual merger or combination of tribal or political structure was required. *Id.* at 776. Because the evidence was insufficient to show a cohesive communal decision by the Duwamish to unite with the Suquamish, we concluded that the Suquamish Tribe could not successfully claim that it was a " 'political successor' " to the treaty time Duwamish Tribe. *Id.* at 777.

■ Colville contends that the *Suquamish* case is distinguishable because Colville is not claiming treaty rights under a successor or merger theory, but rather is asserting rights on behalf of the six tribes who were represented by treaty signatories. Colville distinguishes the Samish situation from theirs because the Samish were no longer functioning as a tribal entity at the time they asserted treaty rights, whereas the constituent tribes in this case were recognized as tribal entities when they entered the Colville Reservation

and continue to maintain their defining characteristics as tribes. The flaw in appellant's efforts is that the constituent tribes in this case have never been recognized as tribes having treaty fishing rights under the 1855 treaties. Our law requires that appellants must trace a continuous and defining political or cultural characteristic to the entity that was granted the treaty rights.

In this regard, our decision in *Washington I* concerning the treaty tribe status of the Muckleshoots is instructive. *See* 520 F.2d at 692–93. Indians who had signed earlier treaties came together to inhabit the Muckleshoot Reservation and were recognized continually thereafter by the government as the Muckleshoot Tribe. We held that by merging into the Muckleshoot Tribe, which was created two years after the treaties were signed, the treaty tribes did not lose their treaty rights. *Id.* We affirmed the district court's recognition of the Muckleshoots as the successor in interest to its constituent treaty tribes because of the clear political continuity of its constituents. The crucial factor which supported our analysis regarding the Muckleshoots, and which distinguishes them from the tribes before us, was that the Muckleshoot Tribe had continuously asserted treaty fishing rights and had always been recognized as the entity possessing these rights. Thus, the continuity of the tribal entity possessing the treaty rights was determinative.

The essential contention of the appellees is that the six relevant constituent tribes of the Colville Confederacy did not maintain the cultural and political identity in the years following 1855 that would be necessary to establish entitlement to rights reserved to treaty tribes. Our own decision in this case must be guided by the factual stipulations of the parties, the facts found by the district court after the evidentiary hearing, and standards established by courts in this circuit dealing with the claims of entities seeking to be recognized as treaty tribes.

■ The record shows that the constituent tribes in 1938 had identifiable cultural and political characteristics that led to their recognition as constituent tribes of the Colville Confederacy. The critical issue, however, is whether the tribes have shown that they have maintained political cohesion with the tribal entities created by the treaties and receiving fishing rights. For the reasons discussed below, we conclude that they have not. We therefore affirm. Because the case involves two different treaties and two different sets of claimants, we deal separately with each.

### The Yakima Treaty:

### The Wenatchi, Entiat, Chelan, Columbia, and Palus Tribes

■ The parties have stipulated that the Wenatchi, Entiat, Chelan, Columbia, and Palus tribes were each parties to the Yakima Treaty of June 9, 1855. The Yakima Treaty of 1855 envisioned the creation of a successor tribe, a "Yakima Nation" composed of all of the people represented by the signatories to the Treaty. The government intended all Indians represented by signatories to the Yakima Treaty to move to the newly established Yakima Reservation and comprise the Yakima Nation. The "Yakima Nation" that actually came into existence, however, was not the same as that originally envisioned. It was composed solely of the Indians who moved to the reservation established by the 1855 Yakima Treaty. The five tribes with which we are concerned here did not move to the Yakima Reservation, but carried out a nomadic existence and subsequently negotiated independent treaties with the government in 1879.

Chief Moses was the Chief of the Columbia and spokesperson for the Wenatchi, Entiat, Columbia, and Chelan. The district court found that Moses was not present at the Yakima Treaty negotiations in 1855 and that Moses was among those who refused to move onto the Yakima Reservation. Instead, Moses "negotiated directly with federal authorities in an attempt to gain a separate reservation for his people" that would encompass the tribe's traditional territories. In the 1879 treaty, the United States agreed to create a separate reservation for Moses called the "Moses Columbia Reservation," which included portions of the aboriginal lands of the Wenatchi, Entiat, Columbia and Chelan.

Moses and the United States returned to the bargaining table in 1883 as a result of mutual dissatisfaction with the terms of the 1879 Columbia Reservation treaty. They agreed to restore the reservation to the public domain and to let Moses and his people relocate to the Colville Reservation. Many of Moses' followers voluntarily relocated to Colville, although the Chelan tribe was moved there by military force in 1890. Neither the 1879 treaty reserving the Columbia Reservation nor the 1883 Colville agreement incorporated or referenced the off-reservation fishing rights that had been reserved by the 1855 Yakima Treaty.

At the time of the 1855 Yakima Treaty, the Palus tribe consisted of a distinct ethnic group of several villages located along the Snake River. The Palus were loosely connected and did not have a cohesive political structure. One Palus leader signed the Yakima Treaty as the representative of the Palus, but the Palus refused to move onto the Yakima Reservation. In the 1880s, a number of Palus began to relocate onto the Colville Reservation.

The present Yakima Nation was recomposed in 1974 and has exercised treaty rights as a successor to the entities that signed the original 1855 Yakima Treaty. As Judge Boldt explained in *United States v. Washington,* 384 F.Supp. at 381, "the Yakima Indians have continued to assert their off-reservation fishing rights, including fisheries in the case area." The Yakima Nation has thus continually exercised the off-reservation fishing rights and continued the fishing culture of the original signatories to the 1855 treaty.

The constituent tribes with which we are concerned have not. The district court in this case made findings relating to the history of the bands who now seek to trace their cultural and political lineage to the tribes that signed the 1855 treaty. These findings reflect that the tribes, prior to being subsumed in the Colville Confederacy, were separate bands who disengaged from the Yakima Nation by refusing to relocate to the reservation established by the 1855 treaty. As the district court found, "Moses and his followers deliberately sought to separate themselves from the 'Yakima Nation' identi-

fied in the treaty." We therefore agree with the result reached by the district court that the descendants of the Wenatchi, Entiat, Columbia, Chelan, and Palus tribes now living on the Colville Reservation are not entitled to exercise treaty fishing rights. We reach this result because we conclude that the constituent tribes when they entered the Colville Confederacy did not retain any treaty fishing rights accorded signatories to the 1855 treaty. We do not agree with the district court that even if the constituent tribes had retained rights, the rights were extinguished by merger into the Colville Confederacy. Nor do we reach the Yakima Tribe's contention that any rights these tribes had were extinguished by subsequent negotiations by Chief Moses of treaties that did not mention fishing rights. Rather, we conclude that by deliberately separating from the Yakima Nation, these tribes failed to maintain political cohesion with the tribal entity in which the treaty fishing rights are vested.

### The Nez Perce Treaty:

#### The Chief Joseph Band of Nez Perce

The parties have stipulated that at the time of the 1855 treaty, the Nez Perce political organization consisted of villages, bands, band groups, and the tribe. The Nez Perce did not recognize one particular leader of the tribe; rather, multiple leaders exercised authority over various functions.

The 1855 Nez Perce Treaty was signed by 54 tribal leaders on behalf of the Nez Perce tribe, including Old Joseph, leader of the Wallawana band. The Treaty extinguished title to some 5.5 million acres in the Pacific Northwest, granted the tribe a reservation of approximately 7.5 million acres, and reserved to the tribe the right to continue fishing at all usual and accustomed places.

In 1863, the United States negotiated another treaty with the Nez Perce, forcing the Nez Perce to relinquish approximately 90% of the original reservation. The 1863 treaty was silent as to fishing rights. Fifty-one Nez Perce leaders signed the 1863 treaty on behalf of the tribe.

The Chief Joseph Band refused to sign the 1863 treaty. The Chief Joseph Band contin-

ued living on their traditional lands until the Nez Perce War in 1877. Following the war, Chief Joseph surrendered, and the surviving members of the band were moved to Kansas and then to Oklahoma. Beginning in 1885, the Chief Joseph Band was allowed to return to the Northwest. Eventually, 150 of the surviving 268 members of the Chief Joseph Band settled on the Colville Reservation.

■ The district court found that the tribal entity reflected in the Nez Perce Treaty of 1855 is the present day Nez Perce Tribe of Idaho. The fishing rights were granted to the Nez Perce Tribe to be enjoyed communally. *See Washington I,* 520 F.2d at 688. The Nez Perce Tribe has continually been recognized as the entity reflected in the 1855 treaty and in which the fishing rights were vested. *See The Nez Perce Tribe of Indians v. United States,* 18 Ind.Cl.Comm. 1, 88 (1967). As the Nez Perce Tribe correctly argues, the fishing rights belong to the tribal entity as a whole, not to its component bands individually.

■ The district court found that the Chief Joseph Band withdrew from the Nez Perce Tribe at least as early as 1863 when it refused to sign the 1863 treaty or move to the Nez Perce Reservation. Because the Chief Joseph Band has not maintained political cohesion with the Nez Perce Tribe, the Chief Joseph Band cannot exercise the treaty rights which were granted to the Nez Perce Tribe. Thus, regardless of whether the Chief Joseph Band moved to Colville as a tribe and has maintained its own defining tribal characteristics, we agree with the result reached by the district court that the descendants of the Chief Joseph Band currently living on Colville cannot assert treaty fishing rights.

### CONCLUSION

The order of the district court denying Colville's motion to intervene is AFFIRMED.