**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff,*

            v.

STATE OF OREGON, STATE OF
WASHINGTON,
                    *Defendants.*

CONFEDERATED TRIBES AND
BANDS OF THE YAKAMA INDIAN
NATION,
                    *Appellee,*

            v.

CONFEDERATED TRIBES OF THE
COLVILLE INDIAN RESERVATION;
JOSEPH PAKOOTAS, Chairman of the
Colville Business Council;
WENATCHI CONSTITUENT TRIBE;
JOHN ST. PIERRE, Spokesman for
the Wenatchi Constituent Tribe,
                    *Appellants.*

No. 03-35773

D.C. No.
CV-68-00513-MFM

OPINION

Appeal from the United States District Court
for the District of Oregon
Malcolm F. Marsh, District Judge, Presiding

Argued & Submission Deferred March 11, 2005
Resubmitted November 24, 2006
Portland, Oregon

Filed December 4, 2006

Before: Procter Hug, Jr., Marsha S. Berzon, and
Jay S. Bybee, Circuit Judges.

18981

Opinion by Judge Hug

---

**COUNSEL**

Harry R. Sachse, Sonosky, Chambers, Sachse, Endreson & Perry, LLP, Washington, D.C., for the appellants.

Fronda Woods, Assistant Attorney General, WSBA# 18728, Olympia, Washington, for the intervenor-appellee.

Tim Weaver, Weaver Law Office, Yakima, Washington, for the intervenor-appellee.

Howard G. Arnett, Karnopp Petersen LLP, Bend, Oregon, for intervenor-appellee.

---

**OPINION**

HUG, Circuit Judge:

In this case we determine whether the Confederated Tribes of the Colville Indian Reservation (Colville) is foreclosed by res judicata from asserting the claim of its Wenatchi Constituent Tribe (Wenatchi) to fishing rights at the Wenatshapam Fishery on Icicle Creek, a tributary to the Columbia River. The Yakama[1] Nation sought and obtained an injunction preventing the members of the Wenatchi Tribe from fishing at that location.[2] In granting the injunction, the district court

---

[1]The name was changed from "Yakima" to "Yakama" in 1994 to reflect the native pronunciation. "Yakama" is used in this opinion, except where historical accuracy requires that "Yakima" be used.

[2]Although Colville's attempt to intervene in *United States v. Oregon* was denied and Colville is, therefore, not a party to that case, jurisdiction

found that Colville's earlier failed effort to intervene in litigation over off-reservation fishing rights in the area served to bar Colville from asserting the alleged rights as a defense to the injunction. *See United States v. Oregon*, 787 F. Supp. 1557, 1572 (D. Or. 1992). We hold that the requisite identity of claims between the earlier intervention attempt and the present injunction hearing does not exist and, consequently, res judicata does not apply. We therefore reverse and remand to the district court for a hearing on the merits.

## I.   Background

In 1855, the United States entered into two treaties with a group of Indian tribes, the Yakama Treaty of June 9, 1855, and the Nez Perce Treaty of June 11, 1855. In this action between the Yakama Nation and the Confederated Tribes of the Colville Indian Reservation (on behalf of the Wenatchi Tribe), only the Yakama Treaty is involved.

The Wenatchi Tribe was one of the fourteen tribes represented at the negotiation of the Yakama Treaty. The treaty specified that tribes "for the purposes of this treaty, are to be considered as one nation, under the name of 'Yakama.' " Treaty with the Yakamas, June 9, 1855, 12 Stat. 951 (1885). Under the treaty, the tribes gave up most of their lands in return for a specific reservation with set boundaries and also

---

is proper because a court may enjoin non-parties whose actions threaten to interfere with prior orders of the court. *S.E.C. v. Wencke*, 622 F.2d 1363, 1370 n.11 (9th Cir. 1980); *see also* Fed. R. Civ. P. 71.

This court reviews for abuse of discretion a district court's decision to issue permanent injunctive relief, *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004), but reviews de novo the underlying legal conclusions on which the district court based its decision. *Biodiversity Legal Fund v. Badgley*, 309 F.3d 1166, 1176 (9th Cir. 2002). "The applicability of the doctrine of res judicata is a question of law subject to de novo review." *In re Schimmels*, 127 F.3d 875, 880 (9th Cir. 1997).

certain other benefits such as schools, a hospital, various services and a payment of $200,000 payable over twenty years. This reservation for the Yakama Nation was to be set apart, surveyed and marked out for the exclusive use of the fourteen confederated tribes of the Yakama Nation. These tribes were to settle on this reservation within one year. The treaty provided "nor shall any white man, excepting those in the employment of the Indian Department, be permitted to reside upon the said reservation without permission of the tribe and the superintendent and agent." *Id*. at art. II, 12 Stat. at 952. The land was later surveyed and set apart as provided in the treaty.

The 1855 Treaty also provided:

> The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.

*Id*. at art. III, 12 Stat. at 953.

The treaty also set aside an additional reservation for the use of the confederated tribes of the Yakama Nation. Article X of the Treaty provided:

> That there is also reserved and set apart from the lands ceded by this treaty, for the use and benefit of the aforesaid confederated tribes and bands, a tract of land not exceeding in quantity one township of six miles square, situated at the forks of the Pisquouse or Wenatshapam River, and known as the

"Wenatshapam Fishery," which said reservation shall be surveyed and marked out whenever the President may direct, and be subject to the same provisions and restrictions as other Indian reservations.

*Id*. at art. X, 12 Stat. at 954.

Despite the promise made in Article X, no attempt was made by the United States to survey the six-square-mile reservation for almost forty years. The Wenatchi remained at this Wenatshapam Fishery Reservation and fished there during this time, firmly believing that a survey would be made and they would be secure in this reservation.

Along with four other signatory tribes, the Entiat, Chelan, Columbia, and Paloose Tribes, the Wenatchi did not move onto the surveyed Yakama Nation Reservation. The Wenatchi remained and fished on their aboriginal lands at the Wenatshapam Fishery until they were moved by the federal government in 1902 and 1903 to the Colville Reservation. Events transpiring during this period are set forth in some detail in *United States v. Oregon*, 787 F. Supp. 1557 (D. Or. 1992), and in our opinion on appeal of that case, at 29 F.3d 481 (9th Cir. 1994).[3]

The United States finally authorized a survey to be conducted of the Wenatshapam Fishery Reservation in 1983. The surveyor, Deputy United States Surveyor Oliver B. Iverson, had established monuments and marks on trees to set out this six-square-mile area. However, before the survey was completed, the newly appointed Yakima Indian Agent, Lewis T. Erwin, ordered Iverson to stop the surveying and destroy all the monuments and trees that had markings. Instead, he directed the surveyor to survey an area some distance away in

---

[3]Extensive details are also provided in E. Richard Hart, *The History of the Wenatchi Fishing Reservation*, 13 W. LEG. HIST. 163 (2000) [hereinafter Hart History], a part of the record in this case.

the mountains next to a lake, but not near the river. When former Yakima Indian Agent Jay Lynch learned that the survey had placed the reservation in the mountains at Lake Wenatchee, he wrote to complain about the whole affair: "I do not think I can give you a clearer idea of the situation than to quote the remarks of an old Indian . . . 'Does our Great Father at Washington think a salmon is an eagle that lives on top of a mountain, or does he think a salmon is a deer that lives in the woods and hills . . . ?' " Hart History at 189.

In the meantime, quite a number of white settlers had settled on the proposed Wenatshapam Fishery Reservation and a railroad had been built through the area. Apparently as a result of these developments, the United States commenced negotiations with the tribes of the Yakama Nation to purchase the area that had been described in Article X of the 1855 Treaty. (The Government had not accepted Agent Erwin's survey of the mountainous area because it was incorrect.) An agreement was executed on January 8, 1894. It is important to note that this was not an amendment to the 1855 Treaty. The agreement provided for the sale for $20,000 of the six-square-mile fishery area that had been described in Article X of the 1855 Treaty. Article I of the 1894 Agreement provided:

> The said Indians hereby cede and relinquish to the United States all their right, title, interest, claim, and demand of whatsoever name or nature of in, and to all their right of fishery, as set forth in article 10 of said treaty aforesaid, and also all their right, title, interest, claim, or demand of, in, and to said land above described, or any corrected description thereof and known as the Wenatshapam fishery.

Agreement with the Yakima Nation of Indians (1894 Agreement), art. I, 28 Stat. 320 (1894).

The Wenatchi contend that the Yakama Nation was unwilling to sell the property without a provision guaranteeing the

land and fishing rights for the Wenatchi Tribe that had continued to live on its aboriginal territory and fishery. In support of this argument, Colville cites to negotiations at the time of entering into the agreement. Indian Agent Erwin stated to Chief John Harmelt, the leader of the Wenatchi Tribe:

> There is one thing I want to impress on these Indians from the Wenatchee, and that is that they are not to be robbed of an acre of land, but, on the contrary, the Government proposes to give them land where they now are. The selling of this fishery does not interfere with their rights at all. The proposition is to buy this little piece of land and to allot to the Indians where they now live.

S. Exec. Doc. No. 67, at 30 (1894).

As a result of these negotiations, the 1894 Agreement contained the following key provision, in Article II:

> After the ratification of this agreement by Congress and the further consideration that the Indians known as the Wenatshapam Indians, residing on the Wenatchee River, State of Washington, shall have land allotted to them in severalty in the vicinity of where they now reside, or elsewhere, as they may select, in accordance with article 4 of the general allotment law.[4]

1894 Agreement, art. II, 28 Stat. at 321. The agreement to provide allotments to the 180 members of the Wenatchi Tribe that were still living at the fishery would have amounted to approximately 24,000 acres. However, the government again failed to fulfill its promise, as it never made the allotments available to the Wenatchi. Hart History at 195-200, 202.

---

[4]The Wenatshapam Indians referred to in the 1894 Agreement are the same as the Wenatchi Indians.

The Wenatshapam Fishery is now occupied primarily by the Leavenworth National Fish Hatchery. The management of the hatchery has welcomed fishing by members of both the Wenatchi and Yakama Tribes. The fish taken are those designated by the hatchery as surplus to its needs. Until the current dispute, the members of the Wenatchi and Yakama Tribes have fished there peacefully. The hatchery has permitted the Wenatchi Tribe to hold its tribal ceremonies on the grounds.

The Yakama Nation has now brought this action for an injunction to exclude the Wenatchi from fishing at the Wenatshapam Fishery, their aboriginal fishery. Colville, on behalf of its constituent tribe, the Wenatchi, defends on the ground of rights granted to the Wenatchi by the 1894 Agreement with the United States that was ratified by Congress. Under the district court's res judicata ruling, however, the Wenatchi Tribe did not obtain a ruling on the merits of their claim. Through unfulfilled promises and procedural rulings, they would, under that ruling, lose both the land they were guaranteed adjacent to the fishery and their fishing rights.

## II.    Procedural Background

In 1968, the United States Supreme Court ruled on the extent state regulation could impinge on tribal treaty rights. *Puyallup Tribe v. Dept. of Game*, 391 U.S. 392, 398-403 (1968). In light of that case, two suits, later consolidated, were filed in 1968 in the U.S. District Court for the District of Oregon to determine the extent of the permissible regulation of Indian treaty fishing rights by the State of Oregon. The progress of that case is summarized in *United States v. Oregon*, 699 F. Supp. 1456 (D. Or. 1988):

> The pending case is the outgrowth of the consolidation of two cases filed in 1968. The first case was designated *Sohappy v. Smith*, [302 F. Supp. 899], while the second was designated by the heading in this case. Each suit was brought against the State of

> Oregon to define the Indians' *treaty right* to take fish "at all usual and accustomed places" on the Columbia River and its tributaries.
>
> . . .
>
> An initial opinion was entered on July 8, 1969 wherein the Honorable Robert C. Belloni *construed the Indians' treaty fishing right* and considered the manner and extent to which the State of Oregon could regulate initial fishing. *Sohappy*, 302 F. Supp. at 911-12. He retained jurisdiction to grant further or amended relief. *Id.*

*Id.* at 1458-59 (emphasis added). The State of Washington was allowed to intervene, and Judge Belloni urged the parties to adopt a comprehensive plan for allocation and management of the Columbia River anadromous fish. A five-year plan was initially adopted, followed by several one-year plans. In 1988, a ten-year plan was adopted.

In 1994, Colville sought to intervene in the *United States v. Oregon* litigation on behalf of five constituent tribes — the Wenatchi, Entiat, Chelan, Columbia, and Palous tribes — that were parties to the Yakama Treaty of June 9, 1855, and on behalf of the Chief Joseph Band of Nez Perce, which was a party to the Nez Perce Treaty of June 11, 1855. Both treaties had reserved off-reservation fishing rights on the Columbia River and its tributaries. Colville was allowed to intervene temporarily on the condition that those constituent tribes could prove that they had 1855 Treaty rights. Judge Marsh stated in his opinion that:

> Colville seeks intervention in a proceeding that has been under the continuing jurisdiction and supervision of this court since 1968. On August 7, 1989, I granted Colville's motion to intervene, on the condition that it first establish that it has federally secured

off-reservation *treaty fishing rights* either by initial grant or by succession in interest.

*United States v. Oregon*, 787 F. Supp. at 1560-61 (emphasis added). After a three-day bench trial on this issue, Judge Marsh concluded:

I find that the Colville Confederated Tribes has failed to establish that it is the successor Indian government and the present day holder of *treaty rights* reserved to the Wenatchi, Entiat, Chelan, Columbia, Palus [Tribes] or Chief Joseph Band of Nez Perce in the treaties of 1855 with the Yakima Nation or with the Nez Perce. Accordingly, the Colville complaint in intervention is dismissed.

*Id*. at 1572 (emphasis added).

Colville appealed the denial of intervention to our court. Although there was some confusion as to whether Colville was asserting a claim as to all of its constituent tribes, this was cleared up at oral argument in that appeal when Colville clarified that it was asserting only the rights of the six constituent treaty tribes. On appeal, we first stated, "[i]t is not disputed that Colville is the only entity that can legally act on behalf of members of the Confederated Tribes, and we agree with Colville that if the constituent tribes retained treaty fishing rights, Colville may properly assert these rights." *United States v. Oregon*, 29 F.3d 481, 483 (9th Cir. 1994), *amended by* 43 F.3d 1284 (9th Cir. 1994).

We went on, however, to affirm Judge Marsh's decision that neither Colville nor the Wenatchi had off-reservation fishing rights flowing from the 1855 Treaty. *Id*. at 486-87. In doing so, we also noted that the parties agreed that the Wenatchi, Entiat, Chelan, Columbia and Palous Tribes were all signatories to the 1855 Treaty, but that "[t]he Yakima Treaty of 1855 envisioned the creation of a successor tribe, a

'Yakima Nation' composed of all of the people represented by the signatories to the Treaty." *Id.* at 485. The five tribes never moved to the reservation created for the Yakama Nation, which was the entity in which the treaty rights vested. *Id.*

We further observed that the present Yakama Nation was recomposed in 1974 and has exercised treaty rights as a successor to the entities that signed the original 1855 Treaty. We concluded that, "by deliberately separating from the Yakima Nation, these tribes failed to maintain political cohesion with the tribal entity in which the *treaty fishing rights* are vested." *Id.* at 486 (emphasis added).

In the present action, the district court determined that the intervention proceeding had a res judicata effect because Colville had the opportunity to raise the claim it is raising now, premised on the 1894 Agreement, in the earlier proceeding, but chose not to.[5] Colville appeals the res judicata ruling, arguing that it was precluded from raising the claim by the district judge's required conditions for intervention, and that the intervention proceeding did not bar consideration of the merits of its claim under the 1894 Agreement.

---

[5]Because it found claim preclusion applied, the district court did not address whether issue preclusion also applied. "The doctrine of issue preclusion prevents relitigation of all 'issues of fact or law that were actually litigated and necessarily decided' in a prior proceeding." *Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988) (quoting *Segal v. Am. Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979)). As our discussion below indicates, the question of whether the 1894 Agreement granted the Wenatchi new rights to fish at the Wenatshapam Fishery was never litigated or decided in the intervention proceeding. Colville is therefore not collaterally estopped from raising the issue in the current action.

## III.  Discussion

### A.  Intervention

**[1]** In order to intervene in the action concerning the treaty rights of the five tribes that had been parties to the 1855 Yakama Treaty, Judge Marsh made it clear that Colville had to establish, as a condition to intervention, *treaty rights* under the 1855 treaties. Colville did not become a party to the litigation, in which it could litigate any other issues concerning fishing rights of any of its constituent tribes, until it satisfied that condition for intervention. Judge Marsh held that Colville failed to do so and denied intervention. The condition that Judge Marsh imposed follows logically from the constraints of Federal Rule of Civil Procedure 24(a)(2), which provides for intervention when "the applicant claims an interest relating to the property or transaction which is the subject of the action." The subject of the action from 1968 on was, as Judge Marsh stated, "to define the Indians' treaty rights to take fish 'at all usual and accustomed places.' " 787 F. Supp. at 1559. A claim to fishing rights resulting from the 1894 Agreement was not a claim of "an interest relating to the property or transaction which is the subject of the action" as specified in Rule 24(a)(2). The subject of the action was the *treaty fishing rights* of the tribes, not fishing rights in general. Colville did seek intervention on the basis that the history of the matter did somehow involve treaty rights of the five Indian tribes. Judge Marsh properly ruled that it did not and denied intervention. Colville did not meet the condition Judge Marsh had set forth to permit intervention and did not meet the requirements of Rule 24(a)(2), as it was not the subject of the action.

**[2]** The scope of Colville's complaint in intervention cannot, therefore, fairly be characterized as solely a function of self-imposed trial strategy.[6] The limitations on the interven-

---

[6]Similarly, Colville's proposed findings of fact regarding the 1894 Agreement, submitted in support of its motion to intervene and ultimately

tion proceeding clearly precluded Colville from asserting the right now claimed by the Wenatchi. The Wenatchi contend that all rights reserved under Article X of the 1855 Treaty were ceded to the United States by the Yakama Nation in 1894, but only after Yakama Nation representatives were satisfied that the Wenatchi would still be able to remain on their land and fish at Wenatshapam. The Wenatchi thus characterize their fishing rights under the 1894 Agreement as *new* rights, granted by the United States as part of its independent agreement to buy back the reservation that should have been, but never was, set aside in Article X of the 1855 Treaty. In other words, according to Colville, the 1894 Agreement both terminated existing treaty rights of the Yakama Nation under Article X and granted entirely new rights (i.e., allotments and fishing privileges) to the Wenatchi.

**[3]** Consequently, the argument based on the 1894 Agreement could not have been part of Colville's claim based on the 1855 Treaty. Because Colville was required to meet the condition of establishing a treaty right before it would be allowed to intervene, it could not advance an argument that the Wenatchi Tribe obtained fishing rights from the 1894 Agreement independent of any treaty rights. In other words, if the Wenatchi acquired rights under the 1894 Agreement that were distinct from those reserved in the 1855 Treaty, Rule 24 itself would have prevented Colville from asserting those separate rights in a proceeding expressly limited to the adjudication of the 1855 Treaty rights.

**[4]** One additional factor counsels against applying res judicata here. In affirming Judge Marsh's denial of Colville's

---

rejected by Judge Marsh, do not support a conclusion contrary to that reached here. The proposed facts are ambiguous, but could be read to assert that the 1894 Agreement itself created new rights for the Wenatchi to the land and fishery identified in Article X (but never properly surveyed and reserved before being ceded and extinguished in 1894). Such an argument would have been improper and impermissible because it did not assert an interest in the 1855 Treaty itself and, therefore, fails under the same logic outlined in the text.

motion to intervene, we found that well before 1894 the Wenatchi had refused to move to the Yakama Nation Reservation and had separated themselves politically from the Yakama Nation, thereby depriving themselves of any 1855 Treaty rights. *See United States v. Oregon*, 29 F.3d at 485-86 (concluding that, based on the evidence, the Wenatchi "deliberately sought to separate themselves" from the Yakima Nation and, therefore, held no rights under the 1855 Treaty).

**[5]** Accordingly, the law of the case supports the view that any fishing rights the Wenatchi gained under the 1894 Agreement must have been new rights. The 1855 Treaty and the 1894 Agreement, therefore, present entirely different transactional nuclei. Such a conclusion is in keeping with our requirement that, "when considering whether a prior action involved the same 'nucleus of facts' for preclusion purposes, we must narrowly construe the scope of that earlier action." *Central Delta Water Agency v. United States*, 306 F.3d 938, 953 (9th Cir. 2002).

The 1894 Agreement was not set forth as an amendment to the 1855 Treaty. Rather, it was an agreement for the sale of the Wenatshapam Fishery that had been given to the tribes of the Yakama Nation by the 1855 Treaty, with specific benefits being reserved for the Wenatchi Tribe, which had continued to reside and fish there.

The Wenatchi Tribe maintains that, under the 1894 Agreement, the Yakama Nation gave up all of its fishing rights in the Wenatshapam Fishery under the provision that states:

> The said Indians hereby cede and relinquish to the United States all their right, title, interest, claim, and demand of whatsoever name or nature of in, and to all their right of fishery, as set forth in article 10 of said treaty aforesaid, and also all their right, title, interest, claim or demand of, in, and to said land

> above described, or any corrected description thereof and known as the Wenatshapam fishery.

1894 Agreement, art. I, 28 Stat. at 320. If the Yakama Nation did give up all its fishing rights at the Wenatshapam Fishery, then it would have no basis for showing the harm necessary for injunctive relief.

The Yakama Nation contends that the provision that gave the special rights to the Wenatshapam Indians did not include fishing rights. The provision states:

> After the ratification of this agreement by Congress and the further consideration that the Indians known as the Wenatshapam Indians, residing on the Wenatchee River, State of Washington, shall have land allotted to them in severalty in the vicinity of where they now reside, or elsewhere, as they may select, in accordance with article 4 of the general allotment law.

*Id.*, art. II, 28 Stat. at 321.

Both provisions appear to be ambiguous in light of the context in which the agreement took place, the statements of the parties concerning the meaning of the terms of the agreement, and the recognition that this was an agreement drafted by the Government to reflect the understanding of the Indians, who had a lesser familiarity with the legal technicalities involved.

This, of course, is a matter to be determined on the merits and is not before us on the res judicata determination.

## B.   Res Judicata

**[6]** Res judicata involves both claim preclusion and issue preclusion. An issue can be precluded in subsequent litigation only if the same issue was actually litigated. *Steen v. John*

*Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997). Issue preclusion is not appropriate here because rights established by the 1894 Agreement independent of any treaty rights were not litigated. In fact, they could not be argued without first meeting the condition of intervention imposed by both Judge Marsh and Rule 24. Consequently, Judge Marsh made no ruling on that subject.

[7] The res judicata ruling by the district court in this action was not based on issue preclusion; rather, it was based on claim preclusion. Under claim preclusion, a subsequent action is precluded if the same *claim* was previously litigated. *Nordhorn v. Ladish Co.*, 9 F.3d 1402, 1404 (9th Cir. 1993). As such, claim preclusion requires an identity of claims. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003). A claim is also precluded if that claim could have been asserted in the prior litigation. *Id.* at 1078. In this case, the claim litigated in the intervention proceeding was whether the five tribes had 1855 Treaty rights. The rights of the Wenatchi Tribe under the 1894 Agreement were not litigated, nor could they have been brought in that proceeding because, as we have discussed, the condition for intervention was not met.

The Yakama Nation relies on the *Tahoe-Sierra* case in contending that Colville is precluded by res judicata from asserting the rights of its constituent tribe, the Wenatchi. That case is easily distinguished. It involved two parties that had been litigating several lawsuits concerning the requirements of the 1987 plan adopted by the Tahoe Regional Planning Commission that was designed to preserve the beauty of Lake Tahoe by limiting development in designated areas. The Tahoe-Sierra Preservation Council, a property owners' association, filed a new action alleging wrongs it had unsuccessfully litigated before. *Id.* at 1076. We held that the association had a full opportunity to contest the provision of the 1987 plan in the prior litigation, and that those claims were, therefore, foreclosed by res judicata. *Id.* at 1086. *Tahoe-Sierra* is very dif-

ferent from the case before us, where Colville was precluded from advancing the claims of the Wenatchi Tribe under the 1894 Agreement by the requirements for intervention imposed by Rule 24 and the district court's order.

**[8]** We conclude that Colville is not precluded by res judicata from asserting the claim of the Wenatchi Tribe to fishing rights at the Wenatshapam Fishery based on the 1894 Agreement; thus, we reverse the district court and remand the case for trial on the merits.[7]

**REVERSED AND REMANDED.**

---

[7]Judge King mentioned in his district court opinion that, "[a]s I noted during oral argument, I had hoped that the parties could reach an agreement on this issue. There is a history of broken promises with respect to many of the tribal entities and I am aware that at least at some level, neither side wishes to be in the position we are in today." The resolution of the res judicata issue by this court presents another opportunity for settlement on the merits of this case.